**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-2360

MELANIE LAWSON,

                Plaintiff – Appellant,

        v.

UNION COUNTY CLERK OF COURT, William F. "Freddie" Gault;
WILLIAM F. GAULT, a/k/a Freddie Gault, Individually,

                Defendants – Appellees.

-------------------------------------

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW;
PENNSYLVANIA CENTER FOR THE FIRST AMENDMENT; COMMON CAUSE,

                Amici Supporting Appellant.

Appeal from the United States District Court for the District of
South Carolina, at Spartanburg.   Timothy M. Cain, District
Judge.  (7:13-cv-01050-TMC)

Argued:  September 17, 2015          Decided:  July 7, 2016

                    Amended:  July 8, 2016

Before DUNCAN and DIAZ, Circuit Judges, and DAVIS, Senior
Circuit Judge.

Vacated and remanded by published opinion.  Judge Duncan wrote
the majority opinion, in which Judge Diaz joined.  Senior Judge
Davis wrote a dissenting opinion.

**ARGUED**: Samantha Clark Booth, MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Appellant. Vance J. Bettis, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellees. Eugene Volokh, UCLA SCHOOL OF LAW, Los Angeles, California, for Amici Curiae. **ON BRIEF**: Mark Epstein, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; John G. Reckenbeil, LAW OFFICE OF JOHN G. RECKENBEIL, LLC, Spartanburg, South Carolina, for Appellant. Sina Safvati, Anjelica Sarmiento, Sabine Tsuruda, UCLA School of Law Students, SCOTT & CYAN BANISTER FIRST AMENDMENT CLINIC, Los Angeles, California, for Amici Curiae.

DUNCAN, Circuit Judge:

Appellee William Gault ("Gault") terminated Appellant Melanie Lawson ("Lawson") from her position as a deputy clerk in the Clerk of Court's Office of Union County, South Carolina. Lawson filed suit, challenging her termination on First Amendment grounds. Gault moved for summary judgment, and the district court granted the motion, holding that Lawson occupied a confidential or policymaking position and was subject to termination for campaigning against her boss. We disagree that Gault has established as a matter of law that Lawson held a position for which political loyalty was required, and we are unable to affirm on any other grounds based on the record as currently presented. We therefore vacate the judgment below and remand for further proceedings consistent with this opinion.

The dissent is so hyperbolic that it seems necessary to stress exactly what is at issue in this appeal. The majority simply reverses the grant of summary judgment to Gault and remands. What the dissent is so exercised about is that the majority does not grant summary judgment to Lawson, who never moved for summary judgment nor otherwise sought such relief. To the extent there is anything remarkable about this opinion, either jurisprudentially or otherwise, it is the dissent's determination to overleap precedent and procedure, and preclude the development of any record evidence, solely to grant Lawson

3

relief she did not ask for and which Gault had no notice of. As we explain below, the issue before this court on appeal is narrow: whether Gault's motion for summary judgment had merit. We conclude that it did not, and our opinion steps beyond that simple question only insofar as we must address the dissent's gratuitous overreach.

I.

A.

This action arises out of Union County, South Carolina's 2012 election for Clerk of Court. Because of the unique statutory characteristics of that position, we begin by describing it briefly.

The South Carolina Constitution creates the position of Clerk of Court for each county. S.C. Const. art. V, § 24. The Clerk is elected to a four-year term through partisan elections, with the Governor empowered to fill any vacancies that arise between elections. S.C. Code Ann. § 14-17-30. The General Assembly prescribes the Clerk's duties. S.C. Const. art. V, § 24. The Supreme Court of South Carolina approves guidelines for the Clerk in connection with the court's responsibility to make rules of court administration. Id. art. V, § 4; see, e.g., Administrative Order Adopting Clerk of Court Manual Revision, S.C. Sup. Ct. Administrative Order No. 2014-05-21-01, dated

4

May 21, 2014, http://www.judicial.state.sc.us/courtOrders/displayOrder.cfm?orderNo=2014-05-21-01. The Clerk is essentially responsible for all the duties typically associated with court administration. See S.C. Code Ann. §§ 14-17-210 to 14-17-760.

South Carolina law authorizes the Clerk to appoint deputy clerks to aid in executing the Clerk's statutory duties. Id. § 14-17-60. Once sworn into office, a deputy clerk is authorized to carry out any of the Clerk's statutory duties. See id. A deputy clerk serves at the pleasure of the Clerk. See id.

The Supreme Court of South Carolina has issued a Clerk Manual, which emphasizes the Clerk's "public relations" role as the sole face of the state court system for many individuals. See Clerk of Court Manual § 1.21 "Public Relations," http://www.judicial.state.sc.us/ClerkOfCourtManual/displaychapter.cfm?chapter=1#1.21. In the Family Court/Child Support Division, where Lawson worked, the sensitive nature of the proceedings gives the Clerk's public relations role greater importance. See id. § 7.18, "Confidentiality in the Family Court," http://www.judicial.state.sc.us/clerkOfCourtManual/displaychapter.cfm?chapter=7#7.18.

Because all Family Court filings are submitted through the Clerk, the Family Court/Child Support Division of the Clerk's

5

Office routinely handles sensitive filings. Cases concerning legal infractions by minors, child neglect and abuse, child custody, divorce, adoption, termination of parental rights, and spousal and child support all originate in Family Court. S.C. Code Ann. §§ 63-3-510, 63-3-530. Further, many Family Court filings, unlike most court documents, are strictly confidential. See, e.g., id. § 44-41-32 (unemancipated minors seeking abortions without parental consent); id. § 63-19-2040 (alleged state law violations by minors); id. § 63-9-780(B) (adoptions). In addition, South Carolina law protects the integrity of filings related to adoptions by making it a misdemeanor, punishable by fine and imprisonment, to disseminate or allow the unauthorized dissemination of such records. Id. § 63-9-780(F)(2). The Family Court/Child Support Division of the Clerk's Office is also responsible for managing the child support account and working with other staff in the Clerk's Office to process the account's monthly statements. See J.A. 96.

B.

Lawson was an employee in the Union County Clerk's Office from 1992 until 2012, beginning as a child-support clerk under June Miller ("Miller"), who at that time was the Clerk of Court. Miller named Lawson the Family Court coordinator before Miller retired from her position as Clerk in 2003.

Lawson continued to work in the Family Court/Child Support Division under Miller's successor, Brad Morris ("Morris"). Morris served as Clerk from 2003 until October of 2009, when he resigned after pleading guilty to embezzling more than $200,000 in public funds from the Clerk's Office. During his term in office, Morris stole cash receivables and falsified deposit slips, beginning with funds from child support receivables and eventually including accounts across the Clerk's Office. Lawson applied for appointment to the vacant position after Morris resigned, but the Governor appointed William F. Gault to serve as Clerk through the next election cycle instead.

At the time Gault took over as Clerk, the office had ten full-time staff members. Gault thereafter received approval and funding from the Judicial Council[1] to hire Miller, the former

---

[1] The Judicial Council is a committee of judges, executive and legislative officials, and private individuals that make findings and recommendations on "the administration of justice" in South Carolina courts. See S.C. Code Ann. §§ 14-27-10 (creation), 14-27-20 (composition), 14-27-70 (duties).

Clerk of Court, as a part-time employee for six months. The parties have stipulated that Gault hired Miller "to perform bank reconciliations in an effort to prevent another lapse like the one that had allowed Mr. Morris to embezzle hundreds of thousands of dollars from the Clerk's Office." J.A. 20.

Gault retained Miller after the six-month period ended, paying her with funds from the child support account. He also selected Lawson to supervise the Family Court/Child Support Division of the Clerk's Office as his deputy. In their respective capacities, Lawson and Miller would interact when Miller had questions about the monthly child support account statements.

C.

Gault opted to run for a full term as Clerk in the November 2012 election, entering the race as a Republican. On March 30, 2012, Lawson declared her candidacy for the Democratic primary,[2] with plans to oppose Gault in the general election. After Lawson informed Gault of her action, Gault placed her on unpaid leave for the duration of her campaign.

Lawson acknowledges that, as her campaign progressed, June Miller became a campaign issue. According to Lawson, she "made

_____

[2] Because of a 2012 South Carolina Supreme Court decision unrelated to the present case, Lawson was ineligible to run in the Democratic primary. She ultimately ran as a Petition candidate in the general election.

statements concerning June Miller's employment with the Clerk's Office." J.A. 186. Specifically, Lawson expressed concern over "where the funds were coming from to pay Ms. Miller," given that Miller continued working after her six-month authorization expired. Id. Lawson explained that she "had a heightened sense of alertness, especially when it involved funds of the Clerk's Office" given Morris's embezzlement scandal. J.A. 187.

Shortly after his election, Gault set up a meeting with Lawson. At that November 14, 2012, meeting, Gault terminated Lawson, telling her that "he had to do what was in the best interest of the office." J.A. 21. Gault would later testify that he terminated Lawson in part for making statements during her campaign regarding Miller's employment at the Clerk's Office, and in part because he was concerned that her continued employment would undermine his authority as Clerk.

Gault explained that, on numerous occasions during the campaign, it was brought to his attention that Lawson was making statements identifying Miller by name. These statements questioned Gault's decision to continue to employ Miller given that the "county council doesn't want June Miller there." J.A. 88. Moreover, Gault was told that Lawson was making statements to the effect that "June Miller should not be in the clerk of court's office" and "June Miller is already drawing her social security and her retirement." Id. According to Gault,

9

he "couldn't very well bring [Lawson] back in and expect her to sit beside June Miller" and interact with the other employees in such a small office under these circumstances. J.A. 92.

### D.

Following her termination, Lawson sued Gault in both his individual and official capacities, seeking monetary damages and an injunction ordering her reinstatement. In her complaint, she alleged that Gault fired her "because of her exercise of her right to run for public office thereby violating her First Amendment rights." J.A. 3.

At the conclusion of discovery, Gault moved for summary judgment. In addition to asserting immunity defenses, Gault argued that the First Amendment did not prohibit him from firing one of his deputy clerks for "perceived political disloyalty." J.A. 31. In making this argument, Gault relied on case law analyzing the Elrod-Branti doctrine, discussed infra, which addresses the First Amendment's limitations on political patronage dismissals.

Lawson opposed the motion, asserting that the Elrod-Branti doctrine was inapplicable, and that "[w]hen a government employer retaliates against a government employee for exercising their First Amendment right to speech the appropriate analysis falls under the Pickering balancing test." J.A. 115. Thus,

10

Lawson urged the district court to apply Pickering, and not Elrod-Branti.

The district court agreed with Gault, and found that Lawson could not establish that she had a First Amendment right not to be terminated after she challenged Gault in her election campaign. Lawson v. Gault, 63 F. Supp. 3d 584, 591 (D.S.C. 2014). Specifically, the district court held that, although Lawson's candidacy implicated her First Amendment rights, she was terminated legally because she occupied a confidential or policymaking position. Id. at 590. The district court noted Lawson's Pickering argument, but centered its analysis on Lawson's position as a "public employee in a confidential, policymaking, or public contact role," which is a factor drawn from the Elrod-Branti doctrine. Id. In other words, the district court resolved Gault's motion based on the grounds Gault raised, and not on the alternative First Amendment doctrine that Lawson raised.

Having concluded that Lawson failed to establish a First Amendment violation, the district court granted summary judgment and declined to address the qualified immunity and Eleventh Amendment immunity defenses that Gault had asserted in his motion. Id. at 591 n.7, 592. This timely appeal followed.

II.

11

A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review de novo the district court's grant of summary judgment. T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 384 (4th Cir. 2012). We apply "the same legal standards as the district court" while "viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." Id. at 385 (quoting Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009)). Our review is not limited to the grounds the district court relied upon, and we may affirm "on any basis fairly supported by the record." Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 222 (4th Cir. 2002) (citing Korb v. Lehman, 919 F.2d 243, 246 (4th Cir. 1990)).

B.

This appeal implicates two lines of cases that grapple with the limitations on a public employee's First Amendment rights. The first doctrine is the "Elrod-Branti" exception, upon which the district court relied. This exception flows from Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980), which held that policymaking employees may be terminated for their political beliefs if "party affiliation is an

12

appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518. The second doctrine, based on Pickering v. Board of Education, 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983), provides that the First Amendment does not protect public employees when their speech interests are outweighed by the government's interest in providing efficient and effective services to the public.

The district court held that Gault was entitled to fire Lawson under the Elrod-Branti exception, because she held a confidential, policymaking position that required political loyalty. For the reasons set forth below, we vacate the order granting summary judgment to Gault and remand for further proceedings. First, we conclude that the district court erred in granting summary judgment to Gault based on the Elrod-Branti exception. Second, we conclude that Gault has not demonstrated an entitlement to qualified immunity or Eleventh Amendment immunity. Third, we decline to resolve the Pickering balancing test on the present record. We address each of these issues below.

C.

We begin with the Elrod-Branti exception, which was at the heart of Gault's motion for summary judgment and the district court's order granting the motion. As we explain, Gault has not

13

satisfied the criteria of the exception, because he has not demonstrated that Lawson's position required political loyalty.

Elrod v. Burns and Branti v. Finkel held that "[t]he First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." Smith v. Frye, 488 F.3d 263, 268 (4th Cir. 2007) (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 64-65 (1990)). This narrow exception to the First Amendment permits patronage dismissals of public employees in policymaking positions in order "to give effect to the democratic process." Jenkins v. Medford, 119 F.3d 1156, 1161 (4th Cir. 1997) (en banc). To determine whether the exception applies, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518.

In this circuit, our Elrod-Branti analysis follows a two-part test adopted from the First Circuit. Stott v. Haworth, 916 F.2d 134, 141-42 (4th Cir. 1990) (citing Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc)). Prong one of the inquiry asks, at a general level,

14

whether the employee's position requires "government decisionmaking on issues where there is room for political disagreement on goals or their implementation." Id. at 141 (citation omitted). If this prong is satisfied, we proceed to the second prong, under which we look at the employee's specific responsibilities, and "focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." Id. at 142 (citation omitted). The government must satisfy both prongs of Stott to establish the Elrod-Branti defense.

We turn now to the attributes of Lawson's position as a deputy clerk, according to the evidence before us. Upon review of the general duties of deputies in the Union County Clerk's Office, we conclude that none of the duties Gault has pointed to satisfy the first prong of Stott. Deputy clerks are generally responsible for administrative and ministerial tasks, such as keeping records and managing court accounts. We see no evidence the deputy clerks perform tasks that relate to "partisan political interests or concerns," and thus we cannot conclude that party affiliation is relevant to an employee's qualification to serve as a deputy clerk. Nader v. Blair, 549 F.3d 953, 960 (4th Cir. 2008); see also Stott, 916 F.2d at 141 (noting the Elrod-Branti analysis requires that the position, "no matter how policy-influencing or confidential it may be,

15

relates to partisan political interests . . . or concerns." (internal quotations omitted)). Put another way, there is no evidence before us that a deputy clerk's political ideology would affect the manner in which she performed her role as a deputy clerk. Critically, Gault has failed to show that his deputies were required to make decisions "on issues where there is room for political disagreement." Stott, 916 F.2d at 141. Therefore, under the first prong of Stott, Gault has not demonstrated his entitlement to summary judgment.

Gault has also failed to point to evidence that would satisfy the second prong of Stott, under which we consider the specific attributes of Lawson's position, as a matter of law. The deputy clerk overseeing the Family Court/Child Support Division is responsible for overseeing case intake, receiving filing fees, collecting and disbursing funds from the child support account, and tracking and reporting court data. Gault has not argued that a deputy clerk would be better suited to carry out these specific tasks if she espoused a particular political philosophy. Nor has he pointed to any specific policies that Lawson was responsible for setting.

Gault has emphasized Lawson's supervisory title, but that role, standing alone, does not tell us that Lawson was a policymaking employee. Though Lawson may have set internal agendas as a supervisor, our decision in Fields v. Prater makes

16

clear that a supervisory employee does not automatically hold a position that is subject to the Elrod-Branti exception. 566 F.3d 381 (4th Cir. 2009). In Fields, we explained that an employee with supervisory power does not necessarily have broad policy setting power. Id. at 387. "If having power over subordinates were a sufficient condition for exemption from the requirements of the First Amendment, only the most low-level government employees would be protected from politically-based hiring and firing." Id. Thus, the mere fact that Lawson was a supervisor did not make her a policymaker.

Citing this court's en banc decision in Jenkins, Gault contends that the Elrod-Branti exception applies because Lawson, as a deputy, was Gault's "alter-ego," authorized by statute to perform all the functions of a Clerk of Court. Contrary to Gault's view, Lawson's statutory authority does not compel the application of the Elrod-Branti exception, and Gault's reliance upon Jenkins in that regard is misplaced. In Jenkins, we held that several deputy sheriffs in North Carolina were lawfully terminated for political disloyalty. Jenkins, 119 F.3d at 1164. Our analysis focused on the fact that deputy sheriffs held a special position under North Carolina law, in that they "act[ed] in the name of and with powers conterminous with [their] principal, the elected sheriff." Id. at 1163 (quoting N.C. Gen. Stat. § 17E-1). At the same time, we emphasized that the

17

"principal" for whom the deputies acted was a political figure responsible for establishing a law enforcement agenda; it was therefore critical to our decision that the sheriff's deputies played a role in implementing these policies.  Id. at 1162-63. Based on the current record, we cannot say the same for Lawson's role as a deputy to Gault.  Though Gault was an elected official, and Lawson did have the statutory authority to act on his behalf, Gault has not demonstrated that any of the duties Lawson carried out in his stead involved setting or implementing a policy agenda.

For the foregoing reasons, we cannot conclude, as a matter of law, that "party affiliation is an appropriate requirement for the effective performance" of Lawson's former position as a deputy clerk.[3]  Branti, 445 U.S. at 518.  Accordingly, we reverse the district court's decision to grant summary judgment to Gault based on the Elrod-Branti exception.

D.

Gault next argues that, even if he has not established the Elrod-Branti defense, he is entitled to qualified immunity from suit for money damages in his individual capacity.  According to

---

[3] We are, of course, limited in our analysis to the evidence before us on appeal.  For this reason, we make no broad proclamations about the roles of deputy clerks generally, for there may well be attributes of those positions--or Lawson's specific position--of which we are not aware.

18

Gault, the contours of the Elrod-Branti exception were not sufficiently clear when he fired Lawson in 2012.

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." Meyers v. Baltimore Cty., 713 F.3d 723, 731 (4th Cir. 2013) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 907 (4th Cir. 2016) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)).

As our analysis of the Elrod-Branti defense illustrates, Gault has not demonstrated, as he must, that Lawson was a policymaking employee for whom political association was an appropriate job requirement. We have repeatedly limited the Elrod-Branti exception to employees who occupy policymaking positions for which political association is relevant, and we think our precedent made this requirement sufficiently clear at the time Gault terminated Lawson. See, e.g., Nader, 549 F.3d at 959; Fields, 566 F.3d at 386; Jenkins, 119 F.3d at 1163-64.

19

In an effort to demonstrate that the law in this area is muddled, Gault cites a 1996 decision in which we held, in an unpublished opinion, that qualified immunity shielded a clerk of court who fired his chief deputy for disloyalty. Appellee's Br. at 36 (citing Conner v. McGraw, 104 F.3d 358 (4th Cir. 1996) (unpublished)). This does not advance Gault's argument, however, because the fact that the law was unsettled in 1996 tells us nothing about the state of the law nearly sixteen years later. As we have explained, the state of the law in 2012 would have put Gault on notice that political affiliation was not an appropriate requirement for administrative employees.

Thus, we conclude that Gault has not established the defense of qualified immunity, and we cannot affirm the district court's judgment on that basis.

E.

Gault next contends that the Eleventh Amendment immunizes him from suit for monetary damages in his official capacity. We find this argument unpersuasive.

The Eleventh Amendment protects the states from suit in federal court, as well as "arm[s] of the State and State officials." Bland v. Roberts, 730 F.3d 368, 390 (4th Cir. 2013) (internal quotations omitted). Our Eleventh Amendment jurisprudence differentiates "arms or alter egos of the state from 'mere political subdivisions of [the] State such as

20

counties or municipalities,' which, though created by the state, operate independently and do not share the state's immunity." United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 804 F.3d 646, 651 (4th Cir. 2015) (alteration in original) (quoting Kitchen v. Upshaw, 286 F.3d 179, 184 (4th Cir. 2002)). To determine whether an entity is an arm of the state, we consider four nonexclusive factors:

> (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State; (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions; (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and (4) how the entity is treated under state law, such as whether the entity's relationship with the State [is] sufficiently close to make the entity an arm of the State.

S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008) (alteration in original) (internal quotation omitted).

Applying the Hoover factors to the record before us, we see no evidence that the Clerk's Office is anything but a county agency that operates locally as an independent subdivision of the state. Significantly, Gault has not argued that a judgment against Gault would be paid from the state treasury. Additionally, the "Handbook for County Government in South

21

Carolina" indicates that the clerk of court and his office draw their funding from the county, and not the state, which suggests that the Clerk's Office operates autonomously from the state. J.A. 198.[4]  Further, Gault's authority as Clerk of Court was limited to Union County, suggesting that he dealt with only local, and not state, concerns.  Based on this evidence, we cannot conclude that the Clerk's Office is an arm of the state of South Carolina.

In support of his Eleventh Amendment defense, Gault points to nothing more than a paragraph of Lawson's complaint that calls the Clerk's Office a "state office" and an 1883 decision from the Supreme Court of South Carolina that characterizes a clerk of court as "State officer" for electoral purposes, State ex rel. Anderson v. Sims, 18 S.C. 460, 463 (1883).  See Appellee's Br. at 41.  Neither the 1883 case nor Lawson's complaint resolve the Eleventh Amendment question before us, because Gault must do more than simply establish a link between the state and his office.  Instead, Gault must demonstrate that the Union County Clerk's Office is an arm of the state, and not an independent subdivision of the state.  Gault's conclusory assertion that the Clerk of Court is a "state officer" does not satisfy his burden to establish Eleventh Amendment immunity.

---

[4] The state does, however, provide "an annual salary supplement" to the Clerk of Court.  J.A. 198.

In the absence of any evidence tying the Clerk's Office to the state of South Carolina, we conclude that Gault has failed to demonstrate that the Eleventh Amendment immunizes him from Lawson's monetary damages claim.

### F.

We next consider the Pickering issue that Lawson has raised. Simply put, the history of this case does not present us with an adequate Pickering record to review. Gault moved for summary judgment based on Elrod-Branti, the district court granted the motion based on Elrod-Branti, Gault urged us to affirm the order based solely on Elrod-Branti, and we now hold that Gault failed to establish the Elrod-Branti defense. This resolves the appeal, and we need not go any further. Although we can affirm on any basis apparent from the record, we conclude that we cannot resolve the Pickering question on this record.

To provide context, we begin with an overview of the Pickering balancing test. As we explained in Smith v. Gilchrist, "the government, as an employer, 'is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies,'" and therefore has "an interest in regulating the speech of its employees." 749 F.3d 302, 308 (4th Cir. 2014) (quoting McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)). When these interests conflict with the free speech rights of public employees, Pickering tells us "to

23

arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568.

In this balancing test, "the government bears the 'burden of justifying the discharge on legitimate grounds.'" Gilchrist, 749 F.3d at 309 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)).[5] However, the government need not "prove that the employee's speech actually disrupted efficiency"; rather, its burden is to show that "an adverse effect was 'reasonably to be apprehended.'" Id. (quoting Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992)); see also Jurgensen v. Fairfax Cty., 745 F.2d 868, 879 (4th Cir. 1984) ("In the application of this test, . . . it is not necessary for the agency to prove that morale and efficiency in the agency have actually been adversely affected by the publication; it is sufficient that such damage to morale and efficiency is reasonably to be apprehended.").

To assess the government's interest, we must consider the context of the employee's speech. Rankin, 483 U.S. at 388 ("In performing the balancing, the [employee's] statement will not be

---

[5] The balancing test is the second of the three elements of a First Amendment retaliation claim. McVey, 157 F.3d at 277-78. The other two elements (speech on a matter of public concern and causation) are not at issue here.

24

considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose."). In Ridpath v. Board of Governors Marshall University, we listed nine non-exhaustive factors that the Supreme Court has considered significant:

> [W]hether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

447 F.3d 292, 317 (4th Cir. 2006) (citing McVey, 157 F.3d at 278). As the sheer number of Ridpath factors demonstrates, this inquiry is fact-intensive and context-specific, and will depend on the arguments the government develops and the evidence it offers.

Turning to the case at hand, we conclude that Gault has not developed a Pickering argument for us to analyze. When Gault moved for summary judgment, he did not raise Pickering as a basis for the motion. Even after Lawson raised Pickering in her opposition brief,[6] Gault dismissed Pickering and urged the

---

[6] This was a curious choice, because Lawson could have refuted the motion by insisting that the Elrod-Branti exception did not apply. Instead, she took on the task of defending her
(Continued)

25

district court to decide the case based on Elrod-Branti. See J.A. 220. Gault argued that it made no difference whether the court analyzed the complaint as a free speech claim, or a claim of retaliation for disloyal candidacy, because Elrod-Branti governed both theories. See J.A. 225 ("[B]ecause, under South Carolina law, Plaintiff was regarded as the alter ego of Mr. Gault, he could terminate her for political disloyalty and/or 'for speech displaying that political disloyalty.'" (quoting Bland, 730 F.3d at 394)).

It is unsurprising, then, that the district court resolved the case on Elrod-Branti grounds. The district court's opinion decided the motion based on its view of Lawson's position as a "confidential, policymaking" employee, a consideration rooted in the Elrod-Branti doctrine. In doing so, the decision tracked the grounds under which Gault moved, because those were the only arguments the motion required the court to resolve.[7]

This pattern continued on appeal. Before us, Gault defended the district court's order exclusively on Elrod-Branti grounds. Gault's brief makes only a passing reference to

---

lawsuit under two different doctrines. Importantly, however, she chose not to move for summary judgment.

[7] Because Gault did not assert Pickering arguments in his motion, it certainly was not error for the district court to decline to analyze that doctrine.

26

Pickering, in which he declined to adopt the application of Pickering to this case:

> Lawson insists that the fact that her First Amendment claim rests not merely on her candidacy but also on her speaking out in support of her candidacy somehow gives added heft to her First Amendment claim that must and can be overcome only by Gault's making an evidentiary showing, under a Pickering-Connick balancing of interests, that her campaign speech actually disrupted the efficient operation of the clerk's office. . . . She is mistaken.

Appellee's Br. at 30-31. Further, Gault's substantive analysis of the balancing test consists of no more than one sentence. See Appellee's Br. at 30-31. Without additional development, this is too slender a reed on which to base an analysis as fact-specific as Pickering requires.

For example, it is unclear whether Gault means to argue that Lawson's specific comments about June Miller threatened office efficiency, or whether Lawson's failed campaign alone was a source of office disruption. We do not mean to say that Gault has failed to justify his actions under Pickering. As we discuss below, the limited record before us indicates that Gault may have colorable Pickering arguments. We simply hold that we cannot resolve the issue based on what the parties have presented to us.[8]

---

[8] For the same reason, we decline to decide whether Gault would be entitled to qualified immunity under a Pickering theory.
(Continued)

27

G.

We turn now to the dissent's contention that Lawson is entitled to summary judgment. This assertion is unusual to say the least, because, as we have noted, Lawson never moved for summary judgment. We should certainly exercise caution before granting a party relief she did not seek. And neither party has asserted Pickering as the ground for a motion, which hinders a meaningful Pickering analysis, and makes it premature to evaluate the issue in the context of this appeal. Additionally, we disagree that there is no evidence that Lawson's conduct interfered with the operations of the Clerk's Office. In view of the Ridpath factors, as we discuss below, we cannot conclude that Pickering compels a judgment in Lawson's favor at this stage of the case, because the record indicates that Gault may have colorable Pickering arguments.[9]

In the course of her campaign, Lawson made a variety of statements about the Clerk's Office and her colleague, June Miller. Some of her comments questioned "where the funds were coming from to pay Ms. Miller," in light of the previous embezzlement scandal. J.A. 186. Lawson also stated that "June

---

[9] To be clear, we do not reach the merits of this issue, and the discussion that follows is only intended to illustrate why Lawson's entitlement to summary judgment, as the dissent proposes, is far from obvious.

28

Miller should not be in the clerk of court's office," that the "county council doesn't want June Miller there," and "June Miller is already drawing her social security and retirement." J.A. 88.

As we consider the Ridpath factors, we first note that Lawson held a supervisory position, and therefore her statements would have a heightened effect within the office. In particular, Lawson's negative public comments about an identified co-worker could affect Lawson's ability to maintain discipline in her division. In fact, the record reflects that Gault expressed concern about this, and noted that he expected that other co-workers would have difficulty working with Lawson going forward. J.A. 92.

For similar reasons, Lawson's comments might have been expected to impair harmony among co-workers and damage close personal relationships. It is of particular significance in this regard that the Clerk's Office consisted of only ten employees. And Gault does assert--in the only sentence of his appellate brief to address Pickering--that the potential for Lawson's public comments to sow discord in his office was a serious concern. See Appellee's Br. at 31.

Ridpath also counsels us to consider whether Lawson's statements would have interfered with the operation and mission of the Clerk's Office. Given Lawson's public-facing role, Gault

29

might argue that her statements would have had this effect. As the Supreme Court Clerk Manual recognizes, the Clerk and, statutorily, the Clerk's deputy, are the public faces of the Office. See Clerk of Court Manual § 1.21 "Public Relations," http://www.judicial.state.sc.us/ClerkOfCourtManual/displaychapter.cfm?chapter=1#1.21. In publicly questioning Miller's presence in the Office and the provenance of the funds used to compensate her, Lawson's comments could have undermined the public's confidence in the Office's integrity and thereby compromised the Office's performance. As we have noted, maintaining the public's trust is especially important to the operations of the Family Court/Child Support Division, which Lawson oversaw.

Of all of the factors set out in Ridpath, the question of whether the speech was communicated to the public or to co-workers in private is arguably the most significant here. Lawson's comments publicly associated a colleague, by name, with accounting irregularities with respect to the very account that the two were responsible for jointly overseeing in the Clerk's Office.[10] Gault explained at his deposition that after Lawson

---

[10] Lawson's own affidavit acknowledges that her statement drew a connection between Miller and alleged accounting irregularities:

My concerns were where the funds were coming from to pay Ms. Miller who was there to help clean up the damage caused by the former Clerk of Court's (Continued)

30

made these comments, he "couldn't very well bring [her] back in and expect her to sit beside June Miller." J.A. 92. Although Lawson and Miller did not literally work side-by-side, it is undisputed that they did work together to jointly manage the account in question and would need to continue to do so if Lawson were to return as deputy. And the fact that Gault and Lawson maintained a cordial relationship has no bearing on how Lawson's comments would have affected Miller, or the Office as a whole.

Our recent decision in Gilchrist provides useful guidance here. In Gilchrist, we considered a First Amendment challenge brought by an assistant district attorney ("ADA") who was terminated for making certain public comments while campaigning for Mecklenburg County district court judge. 749 F.3d at 304-05. During the campaign, the ADA gave an interview where he spoke out against a defensive-driving course run by a nonprofit

---

    embezzlement scandal. . . . After having gone through
    the Morris scandal and being investigated by SLED, I
    had a heightened sense of alertness, especially when
    it involved funds of the Clerk's Office.
J.A. 186-87. From the perspective of the Clerk's Office staff, there could be no benign reason for Lawson to mention Miller by name in connection with these suspicions. Whether Lawson meant to suggest that Miller might have been embezzling funds, or whether she merely thought Miller was being paid with embezzled funds, the statement clearly associated Miller with suspicious accounting.

31

organization independent of the DA's office and unrelated to the ADA's individual responsibilities. Id. at 305 n.1. The program allowed those convicted of traffic violations to receive more lenient punishments, and "substantially reduced the number of cases that the DA's office and the courts were required to handle." Id. at 305. Evaluating these facts under Pickering, we held that the defendant failed to justify the ADA's termination. Id. at 309, 313.

Importantly, in Gilchrist, we relied on facts that were markedly different from those here. In that case, it was central to our decision that "none of the concerns Smith expressed in the interview had to do with Mecklenburg County District Attorney Office policy or in any way impugned the authority or credibility of the DA's office." Id. at 309-10 (footnote and internal quotation marks omitted). For the same reason that the ADA's commentary did not "pertain[] to circumstances within [the DA's] control," there was also no basis for concluding that the ADA's public statements would create "problems with harmony or discipline in the DA's office such that the efficiency of the office would be expected to be adversely affected." Id. at 310. Here, the facts are the very converse of those we relied on in Gilchrist: Lawson's speech targeted her own office and her own colleague, whereas the ADA's statements in Gilchrist did not.

32

The dissent accepts Lawson's argument that Gault failed to adduce evidence of any actual disruption within the Clerk's Office. This argument fails for several reasons. First, it misperceives both the procedural history of this case and the nature of Gault's burden. As we have already discussed, the absence of developed Pickering arguments is unsurprising, given that Gault never moved for summary judgment based on Pickering, and had no reason to develop this theory. It would be unfair to fault him for not doing so. For example, the dissent points to the absence of testimony in the record from other Clerk's Office employees. We cannot know whether other employees were deposed, or whether Gault would wish to depose them to explore this issue. If anything, that is a reason to remand the case for further proceedings, and not a basis for entering judgment for Lawson.

Moreover, our precedent does not require an employer to proffer evidence that the employee's speech caused disharmony or ill feeling. In Maciariello v. Sumner, we examined a First Amendment claim brought by two officers who conducted an unauthorized investigation of their captain. 973 F.2d at 297, 300. We credited the police chief's interest in departmental morale, stressing that it was unnecessary to determine "[w]hether there was any concrete evidence that morale was disrupted" because "the potential for disruption [was] self-

33

evident." Id. at 300; see also Gilchrist, 749 F.3d at 309 (emphasizing that, under Maciariello, a public employer need only show that an adverse effect was "reasonably to be apprehended").

Finally, it would be a mistake to analyze Gault's interests based on the morale in the Clerk's Office at the time Lawson was fired, because the Pickering balance is necessarily forward-thinking, looking to anticipated harms. All that our precedent requires is that an employer reasonably anticipate a future disruption. See Jurgensen, 745 F.2d at 882 n.21 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." (quoting Connick, 461 U.S. at 152)).

In sum, based on the current record, Gault could certainly develop arguments that Lawson's speech interfered with the operations of the Clerk's Office. Therefore, we do not think it is appropriate for us to direct summary judgment for Lawson.

*  *  *

The dissent proposes that we not only reach an undeveloped issue that was not the subject of Gault's motion, but that we take a leap further and grant summary judgment to a party who neither moved for summary judgment nor requested that relief on

34

appeal.[11]   We cannot agree with this proposal.   Instead, we have confined our decision today to the narrow question before us: whether Gault's motion for summary judgment had merit.   Having concluded that it did not, we vacate the order granting the motion and return the case to the district court.   If Gault chooses to pursue a <u>Pickering</u> defense on remand, the merits of his arguments will be for the district court, in the first instance, to resolve.

## III.

For the foregoing reasons, the judgment of the district court is vacated and remanded.   We leave to the sound discretion of the district court the decision whether to permit additional discovery, allow additional motions for summary judgment, or calendar the case for trial.

<u>VACATED AND REMANDED</u>

---

[11] We note that neither of the cases cited by the dissent-- <u>Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp.</u>, 216 F.3d 388, 398 (4th Cir. 2000), and <u>U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n</u>, 873 F.2d 731, 735–36 (4th Cir. 1989)--expressly held that a court of appeals may direct summary judgment to a non-moving party without giving notice to the parties.   We need not opine on our authority to enter summary judgment for Lawson without first giving notice to Gault, because, as we have explained, the circumstances of this appeal counsel against directing such an order.

DAVIS, Senior Circuit Judge, dissenting:

With respect, I believe that my friends in the majority misapply and effectively rewrite a portion of First Amendment jurisprudence in their analysis of this case. First, the majority opinion declines to render partial summary judgment for Plaintiff-Appellant Melanie Lawson, despite determining that Defendant-Appellee William Gault's affirmative defenses under the Elrod–Branti exception,[1] qualified immunity, and Eleventh Amendment immunity fail as a matter of law, and without identifying any genuine issues of material fact that would preclude the entry of judgment on liability. Second, the majority opinion wades into the deep end of a large pool of obiter dicta with its extensive discussion of how its imagined facts might inform application of the Pickering balancing test.[2] Remarkably, it actually suggests that Gault could conceivably satisfy his heavy burden of showing that Lawson's interest in

---

[1] As discussed below, the Elrod–Branti exception allows a public employer to terminate an employee based on political party affiliation where party loyalty is relevant to the employee's position. See Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976).

[2] Under the Pickering balancing test, as explained further below, an adverse employment action taken in response to a public employee's speech may violate the employee's First Amendment rights if the employee's "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." Smith v. Gilchrist, 749 F.3d 302, 308 (4th Cir. 2014) (quoting McVey v. Stacy, 157 F.3d 271, 277–78 (4th Cir. 1998)).

36

speaking upon a matter of public concern in the course of her candidacy for elective office—surely political speech deserving of the protective shield afforded by settled First Amendment principles—did not outweigh the government's interest in providing effective and efficient services to the public, Gilchrist, 749 F.3d at 308 (quoting McVey, 157 F.3d at 277), simply by asserting that Lawson's speech would "self-evident[ly]" cause some disruption in the workplace, see Appellees' Br. 2. And finally, the majority opinion contends that this is the case despite the absence of even a scintilla of evidence that such a disruption was "reasonably to be apprehended." Gilchrist, 749 F.3d at 309 (quoting Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992)); Jurgensen v. Fairfax Cty., 745 F.2d 868, 879 (4th Cir. 1984). I cannot agree.

Each of my good friends forming the majority in this case is a member of the unanimous panel that today decides Brickey v. Hall, No. 14-1910, slip op. (4th Cir. 2016), which is cited and discussed at numerous points in this dissenting opinion. Though assuredly dissimilar in some respects, the two cases share much in common.

The police officer candidate for elective office in Brickey made statements in a questionnaire published in a local newspaper (some but not all of which are set forth infra p. 54)

37

that any reasonable person would regard as calling into serious question his police chief's overall competence and ability to manage a small town's troubled police force. See Brickey, slip op. at 4-5. Parsing the plaintiff's numerous statements that were both directly and indirectly critical of his department and its newly installed chief, the Brickey panel explicitly agrees with the district court's assessment that virtually all of the statements were entitled to First Amendment protection and could not support a decision by the chief to terminate the plaintiff. Id. at 13 n.3 ("We agree with the district court that it was clearly established that Brickey's other comments were entitled to First Amendment protection."). On interlocutory appeal, however, the panel reverses the district court's denial of the police chief's motion for summary judgment based on qualified immunity, solely with regard to the plaintiff's erroneous, and indeed, false, allegations in the newspaper questionnaire that police funds for a drug education program had been "misused." Id. at 4 ("I went in to talk to [the chief] about ordering the supplies for the [drug education program]. I was told there was no money to place the order. After checking with the accounts payable clerk to see where the $500 in the police department budget had been spent, I was shown several invoices that were charged to [that] account. The items on the invoices had

nothing to do with the [drug education] program." (citation omitted)).

Thus, Brickey holds, with particular emphasis on the fact that the erroneous "missing funds" allegations were made in the context of a small town's small police department and about its newly installed chief, that, at the proper level of specificity, the outcome of Pickering balancing as to those allegations was not "clearly established" at the time the plaintiff was terminated in May 2012. Id. at 16 (noting that the dispositive question facing the police chief was, "[W]hen does a police chief's need to maintain discipline and harmony permit him to infringe on an officer's right to make public statements as a political candidate insinuating wrongdoing by a superior officer?").

Although (given that Brickey comes to this Court as an interlocutory appeal) the Brickey panel decides the case on qualified immunity grounds, the reasoning, language, and precedents relied on in that case provide powerful support for the reasoning in, and the gravamen of, this dissent and its Pickering analysis: First, actual record evidence, not unadorned and bald speculation, is necessary to support the assertion by a defendant in a First Amendment retaliation case that respect for a public employee's speech would impose too high a cost on her government employer. Second, the

39

paramilitary character of a law enforcement agency requires greater restraints on the First Amendment rights of officer-employees in such agencies, as compared to the rights of those not so employed. And third, critical to Pickering balancing is the particularized context in which the plaintiff engages in the disputed speech. In my judgment, as I show within, faithful adherence to these longstanding, undisputed, foundational precepts compels a decision in favor of Lawson under Pickering balancing on the record in this case.

Correctly discerning no genuine disputes of material fact, the majority opinion appropriately reverses the district court's grant of summary judgment in favor of Gault under the Elrod-Branti doctrine, and it rules out Gault's qualified immunity and Eleventh Amendment immunity defenses, yet it refuses to render judgment for Lawson. Moreover, the majority opinion declines to resolve the Pickering balancing test, even though it analyzes the issue at length and suggests that Gault may have a viable defense on this ground. I conclude, by contrast, not only that (1) Gault failed to satisfy his burden under Pickering balancing; but furthermore, that (2) the narrow Elrod-Branti exception in First Amendment jurisprudence, invoked by Gault, plainly did not allow Gault to lawfully terminate Lawson; (3) qualified immunity did not protect Gault from liability in his individual capacity; and (4) Eleventh Amendment immunity did

not bar suit for damages against Gault in his official capacity. Accordingly, I would reverse the district court's decision in all respects and remand this action with instructions to enter judgment on liability in Lawson's favor and for further proceedings on relief as necessary.

I.

A.

I begin where the majority opinion concludes by addressing first the Pickering balancing test, as I believe that this issue's resolution at this juncture is proper and central to this case. "Not only does the First Amendment protect freedom of speech, it also protects 'the right to be free from retaliation by a public official for the exercise of that right.'" Gilchrist, 749 F.3d at 308 (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)). An adverse employment action taken in response to a public employee's speech generally violates the employee's First Amendment rights when (1) "the employee 'was speaking as a citizen upon a matter of public concern' rather than 'as an employee about a matter of personal interest'"; (2) the employee's "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public"; and (3) the employee's "'speech was a substantial factor' in the employer's

41

decision to take action against [her]." Id. (quoting McVey, 157 F.3d at 277–78).

Gault does not dispute that the first and third prongs of this test are easily satisfied here, so I, like the majority, focus on the second prong, known as the Pickering balancing test. The relevant question is thus whether Lawson's interest in speaking upon a matter of public concern outweighed Gault's interest in providing effective and efficient services to the public in his operation of the Office of the Clerk of Court. See Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). To make this determination, "the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." Garcetti v. Ceballos, 547 U.S. 410, 423 (2006); see also McVey, 157 F.3d at 277 (noting that, in First Amendment cases, "a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated").

Importantly, no one disputes that Gault bears the "burden of justifying the discharge on legitimate grounds." Gilchrist, 749 F.3d at 309 (quoting Rankin v. McPherson, 483 U.S. 378, 388 (1987)). Although, as the majority opinion emphasizes, the public employer need not "prove that the employee's speech actually disrupted efficiency," the employer must show (by adducing actual record evidence) that "an adverse effect was

42

'reasonably to be apprehended'" in light of the context surrounding the speech. Id. (quoting Maciariello, 973 F.2d at 300); accord Durham v. Jones, 737 F.3d 291, 302 (4th Cir. 2013).

This Court's recent decision in Gilchrist, which two of us on the present panel joined, demonstrates that the Pickering balancing test requires a public employer to offer more than a bald assertion that an employee's speech could have impaired the functioning of the workplace to avoid liability. See Gilchrist, 749 F.3d at 310-12. Rather, our precedent requires the employer to present actual record evidence showing that it was reasonable to expect the employee's speech to cause an adverse effect on the office's ability to serve the public effectively and efficiently. See id. In Gilchrist, district attorney ("DA") Peter Gilchrist terminated assistant district attorney ("ADA") Sean Smith after Smith ran for Mecklenburg County district court judge and, in the course of his campaign for election, criticized a defensive-driving program that the DA's office had recommended to the public. Id. at 305-06. Gilchrist in fact conceded before the federal district court that Smith's interest in speaking on this public matter outweighed the government's interest in providing effective and efficient public services, and the panel noted unanimously that this concession was "with

43

good reason." Id. at 309.  We held that, as a matter of clearly established law,

> it is the right of an ADA running for public office not to be fired for speaking publicly in his capacity as a candidate on matters of public concern when the speech is critical of a program that substantially reduces the DA's office's caseload but there is no reason to believe the speech will negatively impact the DA's office's efficiency.

Id. at 312 (emphasis added).  Properly understood, that clearly stated holding controls the result of Pickering balancing in this case.  Or at least, it should.

Indeed, there is no binding or persuasive authority to the contrary.  In previous decisions, the Supreme Court and this Court have both required a showing of actual record evidence from which it is reasonable to anticipate a disruption in the workplace likely to diminish the provision of governmental services.  See, e.g., Rankin, 483 U.S. at 388–89 ("While [the employee's] statement was made at the workplace, there is no evidence that it interfered with the efficient functioning of the office." (emphasis added)); Durham, 737 F.3d at 301 ("[W]e discern no substantial evidence in the trial record supporting [the employer's] claim" that its "interest in maintaining an efficient and effective law enforcement agency outweighed [the employee's] rights under the First Amendment." (emphasis added)); Bland v. Roberts, 730 F.3d 368, 387 (4th Cir. 2013) ("[D]espite the Sheriff's reference to the need for harmony and

44

discipline in the Sheriff's Office, <u>nothing in the record in this case</u> indicates that [the employee's] Facebook support of [the Sheriff's political opponent's] campaign did anything in particular to disrupt the office or would have made it more difficult for [the employee], the Sheriff, or others to perform their work efficiently." (emphasis added)); <u>Robinson v. Balog</u>, 160 F.3d 183, 189 (4th Cir. 1998) ("In view of the <u>lack of evidence</u> supporting the [government's] interest in disciplining [the employees] for their speech, we hold that the district court erred in precipitously resolving the <u>Pickering</u> balance in favor of the defendants." (emphasis added)).[3]  Moreover, the

---

[3] Several other circuits also require a showing of actual record evidence from which one may reasonably expect a workplace disruption to arise.  <u>See, e.g.</u>, <u>Jordan v. Ector Cty.</u>, 516 F.3d 290, 299 (5th Cir. 2008) ("We need not pause long on the balancing, for there is <u>no record evidence</u> that [the employee's] political activities caused disruptions that would justify termination." (emphasis added)); <u>Murphy v. Cockrell</u>, 505 F.3d 446, 453 (6th Cir. 2007) ("[The employer] presented <u>no evidence</u> that [the employee's] speech impeded her duties at the . . . office." (emphasis added)); <u>Sexton v. Martin</u>, 210 F.3d 905, 912 (8th Cir. 2000) ("[A] simple assertion by the employer that contested speech affected morale, <u>without supporting evidence</u>, is not enough . . . .  Mere allegations of disruption are insufficient to put the <u>Pickering</u> balance at issue." (emphasis added) (citations and internal quotation marks omitted)).

Unsurprisingly, courts have also recognized that even a showing of some tension may be insufficient to tip the scale in favor of the public employer where the employer fails to offer any evidence that one could reasonably expect the disharmony to actually interfere with the government's efficient operation. <u>See, e.g.</u>, <u>Murphy</u>, 505 F.3d at 453 ("[I]t is impermissible to allow a superior to terminate an employee simply because (Continued)

45

majority opinion provides no support for its assertion that it "cannot resolve the Pickering question on this record," ante at 23, nor does it meaningfully distinguish this case from any of the prior cases in which this Court has consistently held that a lack of record evidence of a reasonably anticipated disruption to the workplace warrants a final decision under Pickering in favor of the plaintiff, not remand to provide the defendant another opportunity to meet his burden.[4]

---

tensions that did not impede the functions of the workplace arose over such protected speech.").

[4] To be sure, in Gilchrist, we reversed the erroneous grant of summary judgment for Gilchrist and remanded for further proceedings without explicitly rendering judgment in favor of Smith. See 749 F.3d at 313. But, unlike the majority opinion in this case, the Court in Gilchrist conducted the Pickering balancing test and, upon observing that Gilchrist presented no evidence of a reasonably anticipated workplace disruption, reached a final decision on that issue in favor of Smith. See id. The subsequent trial briefs in Gilchrist reveal that the parties and the district court fully understood that the sole issue remaining after remand was that of causation. See Pl.'s Trial Br. 1, Smith v. Gilchrist, No. 3:10-CV-00636-RJC-DLH (W.D.N.C. June 22, 2015); Def.'s Trial Br. 1, 5, Gilchrist, No. 3:10-CV-00636-RJC-DLH (W.D.N.C. June 22, 2015). In other words, there remained in that case a genuine factual issue related to the First Amendment retaliation claim that warranted further proceedings before liability could be determined. See Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) ("The first two elements involve questions of law. The third element, causation, can be decided on summary judgment only in those instances when there are no causal facts in dispute." (citation and internal quotation marks omitted)). No such issue exists here. Accordingly, rendering judgment on liability in this case is entirely appropriate.

46

B.

1.

Although the majority opinion analyzes the issue at length, it ultimately declines to reach a conclusion regarding <u>Pickering</u> balancing, declaring that the record has not been sufficiently developed to allow for a fair analysis. In particular, the majority opinion seemingly contends that, in the district court, Gault was not seasonably put on notice that the principles of <u>Pickering</u> were at play in this case.

The majority opinion's decision not to reach a conclusion under <u>Pickering</u> is erroneous for multiple reasons. First, examination of the proceedings in the district court demonstrates that the parties presented, and the district court entertained, both written and oral arguments related to <u>Pickering</u> balancing. Indeed, in response to Gault's motion for summary judgment, Lawson specifically contended that <u>Pickering</u> balancing, and not the <u>Elrod</u>–<u>Branti</u> exception, provided the proper doctrinal framework within which this case should be resolved. And Gault's highly experienced counsel argued at the hearing on the motion for summary judgment that "it really doesn't matter . . . how [Lawson's claim is] analyzed." Hr'g Tr. 13, <u>Lawson v. Union Cty. Clerk of Court</u>, No. 7:13-CV-01050(TMC) (D.S.C. May 5, 2014). In fact, at a hearing on Gault's motion for reconsideration (of the district court's

47

original denial of summary judgment as to injunctive relief), Gault's counsel made clear that, although for a period the focus of the case had been on the protected status of Lawson's candidacy, he fully understood that the case was also about the protected status of Lawson's speech in connection with her candidacy: "Your honor, I certainly don't deny bearing some responsibility for not being as clear as I could have, maybe. But once this case gravitated into the Pickering thing, we addressed that in the reply brief and argued that we were entitled to summary judgment [on that basis as well]." Hr'g Tr. 6–7, Lawson, No. 7:13-CV-01050(TMC) (D.S.C. Oct. 30, 2014). Thus, Gault had sufficient notice that he bore the burden of defending his actions under Pickering. That Gault failed to satisfy this burden, as discussed below, warrants summary judgment for Lawson; it does not warrant a remand to the district court to provide him an additional opportunity to do so.

Further, "[w]hen an issue or claim is properly before [an appellate] court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991); accord United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 913 n.3 (4th Cir. 2013). Whether Gault

48

violated Lawson's First Amendment rights by terminating her employment is indisputably an issue that is properly before us, and we may analyze this issue under Pickering or under any other relevant legal theory raised in the district court.

Moreover, the majority opinion's reluctance to perform the Pickering balancing test due to a lack of record evidence supporting Gault's position is unwarranted. The majority opinion suggests that, with proper notice that the district court or this Court might perform the Pickering balancing test, Gault might have deposed other individuals or otherwise sought greater factual support for the proposition that he terminated Lawson to ensure the continued effective and efficient provision of governmental services. Yet given that the majority opinion apparently determined sub silentio that the factual record was sufficiently developed to assess one of Gault's legal defenses—namely, his defense under Elrod-Branti—it is perplexing that the majority opinion deems the same factual record an insufficient basis to assess another of Gault's legal defenses to the same First Amendment claim—namely, his defense under Pickering.

Indeed, the two legal doctrines require consideration of the same type of factual evidence. The Elrod-Branti exception applies where "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S.

49

at 518 (emphasis added); see also id. at 519–20 (noting that the doctrine is intended to "promote[] the effective performance of [the public] office"). Likewise, the Pickering balancing test assesses whether "the interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." Gilchrist, 749 F.3d at 308 (quoting McVey, 157 F.3d at 277–78). Accordingly, the factual evidence that a public employer must put forth under Elrod-Branti—evidence demonstrating that the employee's termination based on political affiliation would further the effective performance of the public office—includes the same evidence that the employer must present under Pickering—evidence that the employee's termination based on her speech was appropriate to ensure the office's continued provision of effective and efficient services to the public. As mentioned above, when he was before the district court, Gault's experienced counsel fully grasped this truism. Thus, if, as the majority opinion takes for granted, the factual record is sufficiently developed to consider Lawson's claims under Elrod-Branti, there is no reason to suppose that the record is insufficiently developed to do the same under Pickering.

2.

A thorough examination of the relevant interests in this case under the Pickering balancing test reveals that the robust

interest in Lawson's core political speech upon a matter of public concern significantly outweighed Gault's unwarranted and speculative belief that Lawson's speech would undermine his interest in assuring that the Office of the Clerk would continue to provide effective and efficient services to the public.

I note first that we must consider Lawson's speech in the context of her political campaign for Clerk of Court against Gault, the incumbent Clerk.[5]  See Gilchrist, 749 F.3d at 309; Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006) ("For Pickering balancing, 'we must take into account the context of the employee's speech' and 'the extent to which it disrupts the operation and mission of the institution.'" (quoting McVey, 157 F.3d at 277)).  In doing so, let's be clear about the particular speech and context at issue. This is not a case in which an employee lashed out at her supervisor or coworker, impugning a colleague's character in an unnecessarily public fashion.  To the contrary, the comments in this case consist of Lawson's statements during her political

---

[5] I strongly believe that, in its lengthy but ultimately inconclusive discussion of the Pickering balancing test, the majority opinion unwittingly compounds its erroneous analysis of Lawson's claim by viewing Lawson's speech without regard for its proper context: that of pure political speech voiced in the course of a partisan campaign for elective office.  See Brickey, slip op. at 15 (Diaz, J.) ("Brickey spoke as a political candidate in a public forum.  In general terms, speaking as a political candidate weighs in favor of speech.").

51

campaign for public office in which she questioned "where the funds were coming from to pay Ms. Miller." J.A. 186. Gault testified that, "around the campaign trail[,] . . . people would say [Lawson] is saying June Miller should not be in the clerk of court's office; June Miller is running the clerk of court's office; . . . why does Freddie Gault got [sic] June Miller in the clerk of court's office[?]" J.A. 88-90. Although Gault admitted that he did not hear Lawson make these comments or, in fact, say anything about Miller throughout the election campaign, he maintained that his receipt of reports about these statements prompted him to fire Lawson.

Far from "publicly associat[ing] a colleague, by name, with accounting irregularities," ante at 30, in statements for which "there could be no benign reason," id. at 30 n.10, as the majority opinion asserts, Lawson's comments, at worst, expressed skepticism regarding the strength of Gault's management of the Clerk's Office and questioned Gault's reliance on the aid of a former Clerk.[6] Lawson's comments concerning the source of funds for Miller's salary also showcased for voters Lawson's

---

[6] Gault himself apparently interpreted Lawson's comments in this manner, rather than as an affront to Miller: "[T]he rumor is going around that [Miller is] running the office, you know. And I don't mean this disrespectful either, but I never even ask her advice . . . . Ms. Miller is not running my office for me. . . . [She is j]ust doing [bank] reconciliations." J.A. 100.

52

"heightened sense of alertness" as to the management of public funds, which she had acquired from her experience in the Clerk's Office during the embezzlement scandal.  J.A. 187.  In other words, her statements highlighted the need for transparency regarding the distribution of public funds.  Accordingly, her speech was precisely the kind of core political speech that one would expect a candidate to make as part of her campaign for elective office.  Compare ante at 30 & n.10 (characterizing Lawson's comments during a political campaign in which she asked "where the funds were coming from to pay Ms. Miller" as statements "associat[ing] Miller with suspicious accounting" for "no benign reason" and suggesting that Gault did not violate the First Amendment by firing Lawson for her speech), with Brickey, slip op. at 13 n.3 (recognizing that a police officer's comments during a political campaign, including "[s]tatements that the department 'needs to be more professional,' 'needs to be more [aggressive] on investigations,' [and] ought to hire an investigator," "offer modest criticism of the department and its chief," "do not raise a reasonable apprehension of disruption," and are "entitled to First Amendment protection" as a matter of clearly established law (first alteration in original) (citation omitted)).

Indeed, all parties agree that Lawson "'was speaking as a citizen upon a matter of public concern' rather than 'as an

53

employee about a matter of personal interest,'" Gilchrist, 749 F.3d at 308 (quoting McVey, 157 F.3d at 277–78), and the majority opinion appropriately notes that this element of Lawson's First Amendment claim is not at issue, ante at 24 n.5.

3.

Bearing in mind the particular speech in question and its specific context, I examine the interest in Lawson's speech. As stated above, it is undisputed that Lawson's comments constituted speech upon a matter of public concern, as they "involve[d] an issue of social, political, or other interest to the community." Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). More to the point, Lawson had a particularly strong interest in speaking on this matter. She certainly had an interest in running for Clerk of Court, as she had worked in the Union County Clerk's Office for twenty-three years and had previously sought the position. She also had an interest in demonstrating to her constituents, as part of her campaign, that she was mindful of the need for proper management of public funds and that she was especially vigilant of the use of Clerk's Office funds, given her experience working there. Core political speech like Lawson's garners "the highest level of protection" under the First Amendment because of the particularly strong interests at stake. Bland, 730 F.3d at 387; see also Meyer v. Grant, 486 U.S. 414, 422, 425 (1988)

54

(recognizing constitutional protection of "core political speech" as being "at its zenith" (citation omitted)).

Moreover, the public itself had a strong interest in Lawson's speech. See City of San Diego v. Roe, 543 U.S. 77, 82 (2004) (per curiam) ("The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it."); McVey, 157 F.3d at 279 (Murnaghan, J., concurring) ("Both the Supreme Court and the Fourth Circuit have explained that the public interest in the employee's speech must be considered when weighing his right to speak against the government-employer's interest in controlling the workplace."). The Supreme Court has "acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." Garcetti, 547 U.S. at 419; see also Gilchrist, 749 F.3d at 308 ("Protection of the public interest in having a debate on matters of public importance is at the heart of the First Amendment." (quoting McVey, 157 F.3d at 277)).

In this case, the public had a considerable interest in ensuring that the Deputy Clerk—someone with significant experience working in the Clerk's Office—would not be deterred from running for Clerk of Court by the prospect of losing her current employment. Moreover, members of the public considering

55

who to elect as the next Clerk had a substantial interest in hearing the comments of one candidate, the Deputy Clerk, concerning the management of Clerk's Office finances under the current Clerk, who was also seeking the position. Indeed, the public's interest in Lawson's speech was especially strong, as her speech concerned the management and expenditure of public funds—the same funds that Gault's predecessor had pled guilty to embezzling while in office.

4.

Because both Lawson and the public had an interest in Lawson's speech upon this matter of public concern, Lawson "could not be fired for making the statements [s]he made unless h[er] right to speak was outweighed by h[er] employer's legitimate interests." Gilchrist, 749 F.3d at 309. Gault bore a particularly heavy burden in identifying legitimate interests in terminating Lawson, for "[a] stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it." McVey, 157 F.3d at 279 (Murnaghan, J. concurring) (citing cases); accord Connick v. Myers, 461 U.S. 138, 152 (1983); Durham, 737 F.3d at 302 ("[I]t is not enough that there is some disruption; the amount of disruption has to outweigh the importance of the speech and its concern to the public."); see also Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 991 (3d Cir. 2014) ("The

56

more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer.").

Nevertheless, in an effort to meet this burden, Gault merely suggested that he lawfully terminated Lawson's employment in response to her political speech because "the potential for disruption is self-evident." Appellees' Br. 32 (quoting Maciariello, 973 F.2d at 300). Gault asserted that this "'self-evident' 'potential for disruption' suffices to strike any required balancing of interests in favor of Gault." Id. My friends in the majority suggest that Gault's "showing" in this respect could warrant summary judgment in his favor. I disagree.

5.

The factual record, which was fully developed in this case (in accordance with the district court's scheduling order, whose deadlines were in fact extended) prior to the motion for summary judgment,[7] indicates that absolutely no adverse effect on the

---

[7] In declining to render judgment for Lawson, ostensibly because Lawson did not affirmatively seek summary judgment, the majority opinion remands to allow for further development of the factual record even though Gault has not urged this Court to do so, indicated that the record is currently underdeveloped, or explained how he might seek to further develop the record. The majority opinion thus purports to give effect to Lawson's intent, emphasizing repeatedly that Lawson has not sought summary judgment, while ignoring Gault's express intent to (Continued)

workplace was "reasonably to be apprehended" had Gault maintained Lawson's employment and declined to retaliate against her for her political speech. Lawson's 2012 campaign for office was remarkably tame and collegial. Of course, as noted above, Lawson did make statements as part of her bid for election in which she asked "where the funds were coming from to pay Ms. Miller," J.A. 186, and questioned Gault's managerial prerogatives. Lawson did not say anything, however, regarding Miller's character or fitness as an employee of the Clerk's Office. Likewise, Lawson did not speak negatively about Gault throughout the campaign or thereafter, aside from making the relatively benign comments described above. Instead, her political advertisements and the message that she and her supporters sought to convey throughout her campaign focused on her years of experience in the Clerk's Office.

Moreover, Lawson remained cordial throughout the entire election period. When Gault instructed Lawson not to involve

resolve the case by summary judgment, without any further factual discovery. As the majority opinion identifies no genuine issue of material fact, it is unclear why it remands for further development of the factual record.

To be sure, in light of the majority opinion's disposition of this case, a decision by the district court to allow further discovery would likely fall within the district court's discretion. I am unconvinced, however, that remand for this purpose is necessary, as there is no genuine issue of material fact and clearly established law plainly favors Lawson.

anyone in the Clerk's Office in her campaign, she obliged; she did not campaign at the office or enlist any of the Clerk's Office employees to help with her campaign. Gault reciprocated Lawson's collegiality, and he attended the visitation for Lawson's husband, who passed away a few weeks before the election and the night before the two candidates were to engage in their only debate. Gault later indicated that he had considered Lawson's husband "a close friend," and he explained that he had attended the visitation "out of respect for him and her." J.A. 177. In light of her husband's passing, Lawson did not attend the debate. When Gault ultimately won the election, Lawson called to congratulate him.

Further, the record is unmistakably clear that, after Lawson had previously applied for appointment as Clerk of Court in 2009 and after the governor appointed Gault to the position instead, the Clerk's Office continued to operate effectively and efficiently while Lawson continued to work there.[8]  In fact,

---

[8] The majority opinion asserts that any reliance on the actual record evidence of the respectful, professional relationship between Lawson and Gault prior to the 2012 election campaign and throughout the campaign somehow "has no bearing on how Lawson's comments would have affected Miller, or the Office as a whole." Ante at 31. This reasoning exemplifies the majority opinion's disdain for actual record evidence of no likelihood of a workplace disruption, coupled with its celebration of the absence of any actual record evidence of a likelihood of a workplace disruption.

(Continued)

59

after his appointment, Gault promoted Lawson from the position of senior employee in the Family Court/Child Support Division of the Clerk's Office to Deputy Family Court Clerk. Lawson continued to serve as Deputy Clerk until Gault placed her on unpaid leave when she announced her candidacy for Clerk of Court.

Finally, the record contains no testimony from anyone other than Lawson or Gault. Not one member of the Clerk's Office—not even Miller—indicated that she would have been unable to work effectively and efficiently with Lawson as a result of Lawson's speech. Only Gault appeared to react negatively to Lawson's

---

Manifestly, it is the majority opinion that has introduced into the record the notion that Lawson "publicly associated a colleague, by name, with accounting regularities," id. at 30, and made "negative public comments about an identified co-worker," id. at 29, for "no benign reason," id. at 30 n.10 (emphasis added), in characterizing, quite unfairly, Lawson's political speech. One can search the record of this case for days and will not uncover any such characterization by Gault, Miller, any of the employees of the Clerk's Office, or the district court. Furthermore, as this dissent pointed out previously in decrying the majority opinion's acontextual approach in this case (in contrast to the approach one sees in Brickey), supra note 5, the majority opinion turns the First Amendment political speech doctrine on its head by joining with Gault to punish Lawson for speaking publicly. Lawson was not running for "Most Likeable Employee of the Clerk's Office/2012"; she was running in a partisan election to become the Clerk of Court. It is unfathomable to suggest that her mere mention of Miller's name in connection with her benign comments about the operational efficiency of the office based on her twenty-three-year career in that very office should only be whispered in private conversations with voters.

comments.[9]  The factual record here stands in sharp contrast to the factual record bearing on the likely effects of the statements disseminated by Brickey in the newspaper questionnaire.  See Brickey, slip op. at 15–16 (observing that "an independent investigation of Brickey's statements [had] concluded that they 'were harmful to the public trust of [the police chief] as well as his integrity'" (citation omitted)).

In short, nothing in the record suggests that it was reasonable to anticipate that Lawson's speech would have caused

_____

[9] Gault testified that, after having terminated Lawson, he explained that decision to some members of the Clerk's Office staff.  He indicated that three of the staff members responded that they had "no [hard] feelings" about his decision to fire Lawson, while one person told him that, in hindsight, she was "kind of glad [Gault] did this," given the potential challenge of working with a Deputy Clerk who had run for election against the Clerk.  J.A. 93.  The staff members apparently said nothing of the likely effect of Lawson's speech, as opposed to the effect of Lawson's seeking election against Gault, and their comments did not provide a reasonable basis upon which Gault could have anticipated an interruption to workplace effectiveness or efficiency, as this discussion occurred after he had terminated Lawson.  I mention Gault's testimony concerning post hoc comments by Clerk's Office employees merely to emphasize that the only putative evidence in the record that Gault could have attempted to put forth to demonstrate the reasonableness of his decision to terminate Lawson is inapposite.  Meanwhile, the record is devoid of any evidence of circumstances prior to Lawson's termination or at the time of Lawson's termination that would have led a reasonable person to conclude that the effectiveness and efficiency of the Union County Clerk's Office would suffer as a result of Lawson's campaign speech.  And further development of the factual record on remand, approximately four years after Lawson's termination, would likely uncover only the same kind of post hoc evidence that has no bearing on the reasonableness of Gault's perception of a likely disruption at the time he terminated Lawson.

even the slightest hiccup in the Clerk's Office's effectiveness or efficiency, let alone a disruption sufficient to overcome the highest constitutional protection for Lawson's core political speech. To the contrary, the record depicts longstanding collegiality and professionalism among all involved. The majority opinion's indefensible decision to hypothesize future workplace disruption on the record before us is nothing if not head-scratchingly inexplicable. In any event, even if, on remand, Gault's experienced counsel should ask the district court to reopen discovery as the majority opinion curiously contemplates, the district court would act quite reasonably to demand to know why any employee of the Clerk's Office (circa 2012) who was not deposed in support of the Elrod-Branti defense should now be deposed in support of Gault's ostensible Pickering defense.

## C.

Despite the absence of any actual record evidence of a potential disruption in the Clerk's Office, the majority opinion takes the unprecedented approach of refusing to announce a decision on Pickering balancing while nonetheless discussing at length its inclination to credit Gault's baldly unsupported statement that he terminated Lawson because he "couldn't very well bring [her] back in and expect her to sit beside June Miller." J.A. 92. The majority's reliance on this assertion in

62

particular is troubling because <u>Lawson and Miller—and, indeed, Lawson and Gault—worked in separate office buildings.</u>[10] Accordingly, Lawson's return to work would not have required that she and Miller sit side by side, even if the record <u>had</u> provided any indication that the two employees would not have been able to work together effectively under those circumstances. In the same vein, according to the majority opinion, "the record reflects that Gault expressed concern about

---

[10] Gault, Miller, and five other Clerk's Office employees worked in the Union County courthouse, while Lawson and three other employees worked in a separate building called the "annex." <u>See</u> J.A. 69. Further discrediting the majority opinion's reliance on its manufactured propinquity as between Lawson and Miller, the latter was a part-time employee at all pertinent times. Indeed, as Gault testified,

> [Miller would] work normally two days a week. Some days it may go three or four weeks where she -- three weeks where she doesn't work, and she just comes back in at the first of the month where our checks are coming in and the reports, and she reviews reports that the general sessions and that child support is doing [sic].

J.A. 98.

The notion that Lawson's speech or her continued employment would have disrupted the work of the Clerk's Office in any legally cognizable manner is fantastical on this record. Unlike the majority opinion, the district court recognized that it was Gault's view of Lawson as his "political enem[y]" that arguably justified her termination. <u>See</u> <u>Lawson v. Gault</u>, 63 F. Supp. 3d 584, 590 n.4 (D.S.C. 2014) (quoting <u>Jenkins v. Medford</u>, 119 F.3d 1156, 1163 n.47 (4th Cir. 1997) (en banc)). For the reasons stated <u>infra</u> pp. 75–85, this dissent (together with the majority opinion) disagrees with that alternative justification for denying Lawson protection for the exercise of her First Amendment rights.

[how Lawson's comments could affect her ability to maintain discipline in her division], and noted that he expected that other co-workers would have difficulty working with Lawson going forward." Ante at 29. Yet no record evidence demonstrates that Gault's subjective concerns were objectively reasonable. Cf. Durham, 737 F.3d at 302 ("[The employer] paid lip service to ostensible damage to office morale, relationships between colleagues, and the function of the office generally, but he was unable to articulate any way in which the office would have been different or was actually different due to [the employee's] statements.").

The majority also speculates that Lawson's employment in a "supervisory position" and "public-facing role" enabled her to have a greater impact on office morale through her speech. See ante at 29–30. Yet once again, this suggestion has no basis in the record—and Gault, who bears the burden at this juncture, did not raise this argument himself. Likewise, although the majority highlights the public nature of Lawson's speech, that it occurred during her campaign for public office is simply not evidence that her speech would damage the Clerk's Office's continued productivity.

Further, in presenting one of the primary bases for its apparent inclination to resolve the Pickering balancing test in Gault's favor, the majority opinion emphasizes that the Clerk's

64

Office comprised only ten full-time employees, and it thus suggests that "[t]he potential for Lawson's public comments to sow discord in his office was a serious concern." Id. at 29 (citing Appellees' Br. 31). The notion that, as Gault asserts, the potential disruption to the Clerk's Office's operation could be "self-evident" is fundamentally at odds with the legal rule firmly entrenched in Supreme Court and Fourth Circuit precedent that a public employer must provide actual record evidence to demonstrate that a disruption is "reasonably to be apprehended," Gilchrist, 749 F.3d at 309 (quoting Maciariello, 973 F.2d at 300). See, e.g., Rankin, 483 U.S. at 388-89; Gilchrist, 749 F.3d at 310, 312; Durham, 737 F.3d at 301; Bland, 730 F.3d at 387; Robinson, 160 F.3d at 189. Yet the majority opinion essentially suggests that Lawson's employment in a small office is sufficient to establish that her speech would inherently cause disharmony in the workplace—and not just any disharmony, but disharmony sufficient to outweigh the robust countervailing interest in Lawson's core political speech—despite all actual record evidence to the contrary. With this reasoning, the majority effectively invokes a new, per se presumption that a public employee who works in a small office and who speaks critically about a matter involving the workplace, no matter the circumstances, is not protected by the First Amendment "right to be free from retaliation by a public official for the exercise

65

of [one's freedom of speech]." Gilchrist, 749 F.3d at 308 (quoting Suarez Corp. Indus., 202 F.3d at 685). Such an acontextual analysis flies in the teeth of controlling precedent.

Perhaps most troubling, the majority opinion's analysis rests on an apparent disapproval of the content of Lawson's speech without regard for its context, as the majority suggests that, at least in part because Lawson "publicly associated a colleague, by name, with accounting irregularities," ante at 30, "Lawson's comments might have been expected to impair harmony among co-workers and damage close personal relationships," id. at 29. In fact, none of the parties or individuals involved in this case suggested that any "accounting irregularities" existed; nor did anyone contend that Lawson's speech might have implied that such irregularities existed.[11] Lawson merely questioned "where the funds were coming from to pay Ms. Miller," J.A. 186—or how Clerk's Office funds were being distributed—in the context of a campaign for Clerk of Court against the incumbent Clerk. Contrary to the image of Lawson painted by the majority opinion, Lawson actually expressed warm personal regard

---

[11] It is useful to recall that, in assessing Gault's motion for summary judgment, the majority opinion acknowledges that it must construe all facts and draw all reasonable inferences in the light most favorable to Lawson. See T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 385 (4th Cir. 2012).

for Miller during the campaign for the positive role Miller had played in her development and career.[12]  See J.A. 169.

In any event, even if Lawson's comments could have had a negative effect on workplace operation under certain circumstances, there is simply no evidence that it was reasonable to anticipate such an effect in the context of this case.  Cf. Robinson, 160 F.3d at 189-90 (holding that the district court erred in resolving the Pickering balancing test in the employer's favor where the employees "allege[d] corruption in the use of public funds" but the employer "failed to present any evidence that . . . [the employees'] speech . . .

---

[12] Lawson stated in an autobiographical "open letter" to voters,

> My involvement with Union County began in 1983 working part - time for former Clerk of Court Pearl S. Kirby. This position was approved for six months and during this time I worked with Uniform Commercial Codes, Judgements [sic] and Child Support Services.  Later, in 1989, I became employed by the Union County Sheriff's Department as a dispatcher and worked 12 hour shifts.  I remained there for three years until former Clerk of Court June H. Miller hired me to work in the Family Court and Child Support Division of the clerk's office.  I was so thankful to her for this opportunity because at the time, I had a young son and needed a 9 to 5 job.

J.A. 169 (emphasis added).  The majority opinion is willing to blink at this affirmative record evidence, as it blinks at other evidence discussed herein, of no likelihood of a substantial disruption had Lawson's employment continued.

interfered with the effective functioning of the [office]"
(emphasis added)).

### D.

While the majority opinion attempts to distinguish this case from Gilchrist by identifying differences between the comments that ADA Smith made about the defensive-driving program and those Lawson made about the source of Miller's salary, the two cases are identical in at least one critically important respect: in both cases, "[t]here simply was no evidence that [the employee's] public statements would cause problems with harmony or discipline in the . . . office such that the efficiency of the office would be expected to be adversely affected." Gilchrist, 749 F.3d at 310 (emphasis added). This Court in Gilchrist repeated this determination again and again: "Nor was there any evidence that Gilchrist had any reason to believe that Smith's interview would negatively affect the efficiency or effectiveness of the DA's office"—even though the content of the speech was "critical of a program that substantially reduces the DA's office's caseload." Id. (emphases added); see also id. at 312 ("Gilchrist certainly was correct to concede that there were no relevant facts upon which he could base an argument that Smith's interest . . . was outweighed by the government's interest . . . ." (emphasis added)).

Moreover, my friends in the majority rely too heavily on the case from which Gault gleaned the phrase "self-evident." In Maciariello, two police officers were demoted after performing an unofficial internal investigation of their captain. 973 F.2d at 296-97. This Court weighed the limited interest of the two investigating officers in their purported speech against the interest of the police department in providing effective and efficient public services. See id. at 299-300. As part of its careful balancing, the Court recognized that a police department is "paramilitary" and has a greater interest than most employers in minimizing "dissension in [its] ranks" as well as "an undeniable interest in discouraging unofficial internal investigations" that could be "very disrupting." Id. at 300; accord Brickey, slip op. at 13 ("It was clearly established in 2012 that police officials are entitled to impose more restrictions on speech than other public employers because a police force is paramilitary—discipline is demanded, and freedom must be correspondingly denied." (internal quotation marks omitted) (quoting Maciariello, 973 F.2d at 300)). The Court also acknowledged that "we do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" Maciariello, 973 F.2d at 300 (emphasis added) (quoting Jurgensen, 745 F.2d at 879). Accordingly, the Court

69

indicated that, "[w]hether there was any concrete evidence that morale was disrupted or not, the potential for disruption is self-evident." Id.

To the extent that Maciariello might suggest that a public employer need not present actual record evidence from which one could reasonably expect an obstruction of the office's operation, two important points bear mentioning. First, the Court in Maciariello discussed several bases upon which one could reasonably anticipate that the specific type of "speech" at issue—performing an unauthorized investigation of the police officers' captain—would prove highly disruptive to a police department in particular, a workplace in which "discipline is demanded." Id. That is, even though the Court did not strictly require the public employer to present actual record evidence of a likely disruption, it nevertheless carefully considered whether "an adverse effect was 'reasonably to be apprehended'" under the specific circumstances of that case. See id. (quoting Jurgensen, 745 F.2d at 879). The majority in this case, by contrast, identifies no basis in the record upon which one could reasonably expect that a Clerk's Office employee's political speech about the source of funds for another employee, made in the context of a campaign for political office, would hinder the operation of the Clerk's Office. Cf. Brickey, slip op. at 21 (emphasizing that "a core abuse of the mission of a police

70

department is reasonably distinguishable from vague allegations of mismanagement or even misuse of funds").

Second, and perhaps of greater salience, the Court's balancing of competing interests in Maciariello and its suggestion that a disruption to the workplace may be "self-evident" were dicta. The Court in Maciariello first determined that the two officers' statements of their suspicions about their captain constituted "speech," but the Court concluded that this speech was not a "but for" cause of their demotions. 973 F.2d at 299. Next, the Court concluded that the larger investigation itself may have been a "but for" cause of the demotions, but the investigation was not "speech." Id. Accordingly, summary judgment for the defendants was appropriate. Only after reaching this holding did the Court offer an alternative basis for its decision, explaining that "[e]ven if these defects were repaired, plaintiffs would lose if their interest as a citizen in the 'speech' is outweighed by the government's interest as an employer." Id. At this point, the Court applied the Pickering balancing test. Accordingly, the Court's analysis under Pickering was merely dicta and did not constitute binding law. See Alexander v. Sandoval, 532 U.S. 275, 282 (2001) ("[T]his Court is bound by holdings, not language."); United States v. Pasquantino, 336 F.3d 321, 329 (4th Cir. 2003) (en banc) ("The first significant problem is

71

that the statements [the defendants] rely upon . . . are pure and simple dicta, and, therefore, cannot serve as a source of binding authority in American jurisprudence.").

* * * * *

To conclude on Pickering balancing, the majority opinion forges an unprecedented path in refusing to consider the legal issue outright, even though the matter is properly before us and the majority identifies no genuine issue of material fact preluding summary judgment. Yet the majority opinion nonetheless contains a lengthy hypothetical Pickering analysis, during which it constructs its own palette, rather than relying on the record coming to us from the district court, on which to paint its narrative suggesting a likely denial of Lawson's right to the enjoyment of her First Amendment freedoms. The reasons offered by the majority opinion for painting what it paints are barren of actual evidentiary support in the record. Further, the majority opinion eschews affirmative evidence in the existing record of a strong likelihood of the Clerk's Office's continued provision of effective and efficient public services despite Lawson's speech. The majority opinion asserts that Lawson's political speech:

> "could affect Lawson's ability to maintain discipline
> in her division," ante at 29, but there is no actual
> record evidence to support that speculation; and that

72

"Gault expressed concern about [Lawson's ability to maintain discipline], and noted that he expected that other co-workers would have difficulty working with Lawson going forward," id., but there is no actual record evidence to support that speculation; and that

"Lawson's comments might have been expected to impair harmony among co-workers and damage close personal relationships," id., but there is no actual record evidence to support that speculation; and that

"Given Lawson's public-facing role, . . . Lawson's comments could have undermined the public's confidence in the Office's integrity and thereby compromised the Office's performance," id. at 29–30, but there is no actual record evidence to support that speculation.

In light of the clearly established law set forth in binding precedent regarding the need for actual record evidence demonstrating that it is reasonable to anticipate an adverse impact on workplace effectiveness and efficiency, it is confounding that Gault argues, and the majority appears to credit, that such a disruption could be "self-evident"—and that this assertion by a public employer alone could be sufficient to outweigh the substantial interest in Lawson's core political speech.

One would have thought, before today (and even as of today, in light of the excellent opinion in Brickey), that the reasonableness requirement inherent in the "reasonable apprehension of disruption" metric draws its meaning from actual record evidence. After today in the Fourth Circuit, if the majority opinion's dicta is given full effect, such

73

"reasonableness" determinations will more often be a function of whatever can be conjured in the fertile imaginations of federal judges. This distortion of settled First Amendment doctrine is unwarranted, unwise, and unsupportable. I regret this development.

## II.

Having determined that the Pickering balancing test weighed in Lawson's favor, I next consider whether her termination may nevertheless have been lawful under the Elrod-Branti exception. While the district court granted summary judgment for Gault based on its determination that this exception applied, de novo review of this matter is appropriate. See T-Mobile, 674 F.3d at 384. Like the majority opinion, I would hold that the Elrod-Branti exception is inapplicable to this case, and, as such, summary judgment for Gault was improper on this basis as well.

## A.

In Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980), the Supreme Court established a narrow exception to the general rule that terminating a government official on the basis of political affiliation is presumptively unconstitutional. See id. at 515-16; Bland, 730 F.3d at 374. Under this exception, dismissal on the basis of political affiliation may be lawful where the public employee occupies a policymaking or confidential position for which

74

effective job performance requires allegiance to a particular party. See Branti, 445 U.S. at 518. Thus, an individual employed in such a position who "speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." Bland, 730 F.3d at 374 (quoting McVey, 157 F.3d at 278).

The Supreme Court has made clear, however, that this exception is narrow, see id., and it has emphasized that "party affiliation is not necessarily relevant to every policymaking or confidential position," Branti, 445 U.S. at 518. For example, "[t]he coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government." Id. Likewise, "although an assistant is bound to obtain access to confidential information arising out of various attorney-client relationships, that information has no bearing whatsoever on partisan political concerns." Id. at 519. Thus, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 518.

75

In Stott v. Haworth, 916 F.2d 134 (4th Cir. 1990), this Court developed a two-part test to determine whether the Elrod–Branti exception applies. Bland, 730 F.3d at 375 (citing Stott, 916 F.2d at 134). First, we consider whether "the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests . . . [or] concerns.'" Stott, 916 F.2d at 141 (alterations in original) (quoting Branti, 445 U.S. at 519). In other words, we examine whether "the position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation." Id. This inquiry requires an exploration of the public employee's position "at a very high level of generality." Bland, 730 F.3d at 375 (quoting Fields v. Prater, 566 F.3d 381, 386 (4th Cir. 2009)).

If the first prong is satisfied, we proceed to the second step, where we "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement." Id. (alteration in original) (quoting Stott, 916 F.2d at 142). This step "requires a much more concrete analysis of the specific position at issue." Id. (quoting Fields, 566 F.3d at 386). Even at the second step, however, we examine only "the

76

job description for the position in question," rather than considering the "functions performed by a particular occupant of that office." Id. (quoting Stott, 916 F.2d at 142). We thus must determine whether "political loyalty was an appropriate requirement for the effective performance of the public employment of the [plaintiff] before us in light of the duties of [her] particular position[]." Id. at 377.

## B.

Gault argues that Lawson's position as Union County Family Court Deputy Clerk fits under the Elrod–Branti exception. He has failed, however, to make this showing, and, based on the record evidence, I would hold that the Elrod–Branti exception is inapposite to this case.

## 1.

Under the first prong of the Stott two-part test, Gault has not shown, at a high level of generality, that the position of Deputy Clerk of Court relates to partisan political interests or that "the position involve[s] government decisionmaking on issues where there is room for political disagreement." See Stott, 916 F.2d at 142. The responsibilities of Deputy Clerks are generally limited to ministerial and administrative tasks, and such responsibilities do not afford the Deputy Clerks any discretion for which political affiliation might be relevant.

77

Gault has therefore failed to satisfy the first prong of Stott, and the Elrod-Branti exception is inapplicable to this case.

2.

Even if I were to conclude otherwise and proceed to the second prong of Stott, I would nevertheless hold that Lawson's particular responsibilities as the Union County Family Court Deputy Clerk did not transform her position into one for which "party affiliation [or political allegiance] is an . . . appropriate requirement." Bland, 730 F.3d at 375 (first alteration in original) (quoting Stott, 916 F.2d at 142).

Under South Carolina Law, a Deputy Clerk of Court may perform all duties of the Clerk of Court, see S.C. Ann. § 14-17-60, so I begin by exploring these responsibilities. The Clerk of Court "keeps records of the proceedings," "is charged with managing the juries and the county grand jury," and is responsible for "[t]he custody of the courthouse," including "the assignment of office space within the courthouse." J.A. 198. With regard to Family Court in particular, the Clerk of Court's duties include "recouping the costs of public assistance from parents with legal obligations for child support" and, in some cases, "charg[ing] a fee of five percent of the delinquent amount." Id. In addition, the Clerk "performs duties relating to the recording of land titles, liens and other documents affecting land titles." Id.

78

The obligations of a Deputy Clerk in particular include similarly administrative tasks, such as "setting up accounts and refunding payments when cases were closed," issuing judges' orders, aggregating and reporting court data, and collecting receipts. J.A. 165, 167, 169. Based on these perfunctory responsibilities, I see no indication that "party affiliation is an appropriate requirement for the effective performance of the public office." See Branti, 445 U.S. at 518.

Gault argues that the Clerk of Court, as well as a Deputy Clerk serving as the Clerk's alter ego, may also perform a number of tasks that involve policymaking. For instance, a Deputy Clerk may "refer cases to a master in equity or special referee for final disposition; order that, under specified circumstances, personal property be seized and sold; suspend income withholding for spousal or child support in Family Court cases; and even declare drainage districts within the[] county and make and enter final orders regarding the same." Appellees' Br. 25 (citations omitted). Yet even if these tasks did involve some amount of policymaking discretion—which remains unclear— Gault has failed to show that these responsibilities require the Deputy Clerk to hold a particular partisan affiliation. Like the hypothetical football coach discussed in Branti, the Deputy Clerk of Court does not appear to hold a position for which "party affiliation is an appropriate requirement for the

79

effective performance of the public office," Branti, 445 U.S. at 518, for surely a Republican and a Democrat would be equally suited to refer cases to a master in equity (when instructed to do so by a judge) or to declare a drainage district. Cf. Fields, 566 F.3d at 387 ("It is not enough for defendants to show merely that local directors make some policy; the ultimate question under Branti is whether local directors make policy about matters to which political ideology is relevant, and we conclude that they do not.").

Further, Lawson's duty to supervise three other staff members did not vest her with the kind of "significant discretion" that requires political party allegiance. Knight v. Vernon, 214 F.3d 544, 551 (4th Cir. 2000) (quoting Jenkins, 119 F.3d at 1162); see also Fields, 566 F.3d at 387 ("If having power over subordinates were a sufficient condition for exemption from the requirements of the First Amendment, only the most low-level government employees would be protected from politically-based hiring and firing.").

In the same vein, that Lawson's position made her privy to confidential information or that the position required her to communicate with the public is insufficient to warrant application of the Elrod-Branti exception without an additional showing that "party affiliation is an appropriate requirement for the effective performance of the public office." See

80

*Branti*, 445 U.S. at 518. In *Fields*, for instance, an applicant for the position of local director of the Buchanan County Department of Social Services brought suit against members of the Buchanan County Board of Supervisors for allegedly denying her the position because of her party affiliation. 566 F.3d at 384. The defendants in that case asserted that, "because a local director's duties involve confidential information, political affiliation is a relevant consideration under *Stott*." *Id.* at 387. We rejected this argument, however, as "many social services workers deal with confidential information. Yet it cannot be the case that party affiliation is an appropriate criterion for the effective performance of their jobs." *Id.* at 388. This Court held that the *Elrod*-*Branti* exception was inapplicable and noted that "defendants attempt[ed] to fit the local director position into the labeled category 'confidential' without explaining how it proves that political affiliation is actually relevant to a local director's duties." *Id.* Here too, Gault emphasizes the confidential nature of Lawson's position and Lawson's role as a communicator without establishing that political affiliation was actually relevant to the Deputy Clerk's duties.

3.

Further, this case differs significantly from *Jenkins*, in which this Court held that North Carolina deputy sheriffs were

81

policymakers who may be lawfully terminated for political reasons under the Elrod–Branti exception. 119 F.3d at 1164 (en banc). In reaching its decision, this Court considered that "deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable," and that a deputy sheriff "hold[s] an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff." Id. at 1163. Similarly, because "the sheriff can be held liable for the misbehavior of the deputies," a deputy sheriff "serve[s] at the pleasure of the appointing officer." Id. at 1163–64.

Although much of the same is true for Deputy Clerks relative to the Clerk of Court, this case differs from Jenkins in one key respect: the Court in Jenkins relied on the North Carolina legislature's determination that the sheriff is "an important political figure." Id. at 1163 (emphasis added); see also id. at 1164 n.52 ("The sheriff's position in government vests in him and his deputies 'substantial responsibility for or control over the conduct of governmental affairs.'" (quoting Cline v. Brown, 210 S.E.2d 446, 449 (N.C. Ct. App. 1974))). The Court in Jenkins thus emphasized that deputy sheriffs "play a special role in implementing the sheriff's policies and goals," that deputy sheriffs exercise "significant discretion in performing their jobs," and that, "[i]n the course of their

duties, deputies will make some decisions that actually create policy." Id. at 1162 (citation and internal quotation marks omitted). Accordingly, a deputy sheriff, who is the alter ego of the sheriff and serves at the sheriff's pleasure, also occupies a political position covered by Elrod–Branti.

The Union County Clerk of Court, by contrast, is limited to ministerial, administrative duties such that a Deputy Clerk, who is the alter ego of the Clerk and serves at the Clerk's pleasure, occupies an equally apolitical position. The limited policymaking that the Clerk of Court and his Deputy Clerk might perform does not allow for "significant discretion" of any kind. Thus, Gault has failed to show that the position of Deputy Clerk requires political allegiance to the Clerk.

4.

Most tellingly, the facts in this case clearly demonstrate both that political party allegiance was not a requirement of the Deputy Clerk position and that a lack of political allegiance would in no way hinder the operation of the public office. Gault indicated that he was "never asked" about his political affiliation when he applied for the vacant position of Clerk of Court in 2009. J.A. 75. After Gault's appointment, Lawson, a Democrat, served as Deputy Clerk under Gault, a Republican, for nearly a year before Lawson announced her

candidacy.  In fact, as discussed above, <u>Gault had actually promoted Lawson to that position</u>.

As one might expect, given that the Clerk and his Deputy Clerks perform largely administrative tasks, the record contains no indication that the bipartisan composition of the Clerk's Office affected the office's operation.  I therefore cannot conclude that Lawson's political beliefs, which had differed from Gault's for a significant period of time, somehow became sufficiently relevant to her position as Deputy Clerk after the 2012 election to provide lawful grounds for Lawson's termination.  <u>Cf.</u> <u>Fields</u>, 566 F.3d at 387 ("Defendants make conclusory assertions about the local director's policymaking power, but they cannot show 'a rational connection between shared ideology and job performance.'" (quoting <u>Stott</u>, 916 F.2d at 142)).  Accordingly, I would hold that the <u>Elrod</u>–<u>Branti</u> exception is inapposite to this case.  I would reverse the district court's grant of summary judgment for Gault on this basis.

III.

Gault next argues that he is entitled to qualified immunity with respect to Lawson's claims against him in his personal

84

capacity.[13]  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Gilchrist, 749 F.3d at 307 (quoting Stanton v. Sims, 134 S. Ct. 3, 4 (2013) (per curiam)).  To defeat a claim of qualified immunity, a plaintiff must demonstrate that "(1) the allegations underlying the claim, if true, substantiate [a] violation of a federal statutory or constitutional right" and that "(2) this violation was of a clearly established right of which a reasonable person would have known" at the time of the violation.  Id. at 308 (alteration in original) (quoting Ridpath, 447 F.3d at 306); see McVey, 157 F.3d at 276.  That said, "[t]he burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense."  Meyers v. Balt. Cty., 713 F.3d 723, 731 (4th Cir. 2013).

In assessing whether the governing law was clearly established, "[w]e do not require a case directly on point";

---

[13] The majority opinion only addresses Gault's qualified immunity defense in conjunction with the Elrod–Branti exception and declines to examine this defense with respect to Pickering balancing.  For the reasons expressed above regarding the propriety of performing the Pickering balancing test on the current record, I consider Gault's qualified immunity defense under both legal theories.

rather, "existing precedent must have placed the statutory or constitutional question beyond debate." Gilchrist, 749 F.3d at 307–08 (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011)). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Meyers, 713 F.3d at 734 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). This Court has indicated that, "particularly in First Amendment cases, where a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, 'only infrequently will it be "clearly established" that a public employee's speech on a matter of public concern is constitutionally protected.'" McVey, 157 F.3d at 277 (quoting DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995)).

A.

Nevertheless, this Court has repeatedly recognized that the employer is certainly not entitled to qualified immunity in all public employee speech cases. Indeed, in Robinson, 160 F.3d at 189, in Durham, 737 F.3d at 303–04, and most recently in Gilchrist, 749 F.3d at 313, this Court rejected the employer's assertion of qualified immunity. In each case, this Court based its "decision to deny qualified immunity in large part on 'the lack of evidence supporting the [government's] interest in disciplining [the employees] for their speech.'" Brickey, slip

86

op. at 21 n.6 (alterations in original) (quoting Robinson, 160 F.3d at 189); see also Ridpath, 447 F.3d at 321 (holding that an employer was not entitled to qualified immunity for terminating an employee "for making protected statements that [the employer] did not like" and noting that "a clearer violation of constitutionally protected free speech would be difficult to fathom"). The case before us most closely mirrors Gilchrist in this manner.

In Gilchrist, we began by defining Smith's First Amendment right at issue, at the appropriate level of specificity:

> [I]t is the right of an ADA running for public office not to be fired for speaking publicly in his capacity as a candidate on matters of public concern when the speech is critical of a program that substantially reduces the DA's office's caseload but there is no reason to believe the speech will negatively impact the DA's office's efficiency.

749 F.3d at 312.

We next concluded that "[a]ny reasonable official in Gilchrist's position would have been aware of that right on the day of Smith's termination" in July 2010. Id. In reaching this conclusion, the Court explained that, by July 2010, "it was well established that a government employee's speech made as a private citizen on a matter of public concern is balanced against the adverse effect that the government reasonably anticipates the speech will have on its ability to operate efficiently." Id. The Court emphasized that, under the

87

circumstances in Gilchrist, "there was no evidence forecasted in the summary judgment record" that Gilchrist might reasonably expect Smith's speech to have any particular effect on the workplace. Id. at 312–13. Accordingly, the Court explained that "the general complexity of the balancing test is of no consequence in this case since there is nothing on the employer's side of the ledger to weigh." Id. at 313. We held that Gilchrist had violated Smith's clearly established right and was therefore not entitled to qualified immunity. Id.

B.

1.

Much like the constitutional right at issue in Gilchrist, the First Amendment right implicated in this case is the right of a Deputy Clerk of Court running for public office not to be fired for speaking publicly in her capacity as a candidate on matters of public concern when the speech is critical of the source of funding for a coworker's salary but there is no reason to believe the speech will negatively impact the Clerk's Office's efficiency. Cf. id. at 312. As I have already determined that Gault's termination of Lawson violated Lawson's right in this manner, the only remaining question is whether this "right was 'clearly established' at the time of the acts complained of such that an objectively reasonable official in [Gault's] position would have known of the right." McVey, 157

88

F.3d at 276 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

As was true of the right at issue in <u>Gilchrist</u>, any reasonable official in Gault's position would have been aware of Lawson's right, as defined above, on the day of Lawson's termination. <u>Cf.</u> 749 F.3d at 312. Indeed, the Court in <u>Gilchrist</u> determined that a nearly identical right had been clearly established at the time of Smith's termination in July 2010. <u>See</u> <u>id.</u> It naturally follows that the right at issue here was clearly established at the time that Gault terminated Lawson's employment in November 2012. No Supreme Court or Fourth Circuit case muddled this area of law in the interim.[14]

Moreover, the Court's reasoning in <u>Gilchrist</u> holds true here as well. That is, it was clearly established in November 2012 that a court must balance a public employee's speech on a

---

[14] Gault argues that <u>Underwood v. Harkins</u>, 698 F.3d 1335 (11th Cir. 2012), which was decided one month before Lawson's termination, demonstrates that Gault did not violate clearly established law. In <u>Underwood</u>, the Eleventh Circuit affirmed a grant of summary judgment in favor of a Georgia superior court clerk who had terminated a deputy clerk's employment after both had run for the superior court clerk position. <u>Id.</u> at 1337–38, 1345–46. As the right at issue was clearly established under binding Fourth Circuit case law in November 2012, however, the decision of another circuit did not affect the clarity of governing precedent in this Circuit. <u>See</u> <u>Hill v. Crum</u>, 727 F.3d 312, 322 (4th Cir. 2013) ("[W]e have long held that it is case law from this Circuit and the Supreme Court that provide[s] notice of whether a right is clearly established." (first alteration in original) (citation omitted)).

89

matter of public concern against the government's interest in providing effective and efficient services. See McVey, 157 F.3d at 277. It was also clearly established at the time that the public employer bears the burden of justifying the employee's discharge on legitimate grounds, Rankin, 483 U.S. at 388 (citing Connick, 461 U.S. at 150), such as by demonstrating that "damage to morale and efficiency is reasonably to be apprehended," Jurgensen, 745 F.2d at 879. Where, as here, the public employer offers no evidence to demonstrate that the employer could reasonably have expected the office's effectiveness and efficiency to suffer as a result of the employee's speech, it was clearly established that the balance would tip in favor of the employee. See Gilchrist, 749 F.3d at 313.

2.

Further, as the majority opinion concludes as well, it was clearly established in November 2012 that an employment position that does not "relate[] to 'partisan political interests . . . [or] concerns,'" Stott, 916 F.2d at 141 (second and third alterations in original) (quoting Branti, 445 U.S. at 519), is not a position from which an employee may be terminated based on political affiliation under Elrod-Branti. Thus, where there is no indication that political party allegiance was relevant to the effective performance of an employee's duties, a reasonable person would have known in November 2012 that termination of

90

that employee based on political affiliation was unlawful. Accordingly, I would hold that Gault violated clearly established law by terminating Lawson's employment, and he is therefore not entitled to qualified immunity.

## IV.

Finally, Gault argues that he is not subject to suit for damages in his official capacity due to Eleventh Amendment immunity. The Eleventh Amendment bars suit against state officials in their official capacity for damages under 42 U.S.C. § 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Local officials, however, generally do not enjoy Eleventh Amendment immunity. Cash v. Granville Cty. Bd. of Educ., 242 F.3d 219, 222 (4th Cir. 2001). The government official asserting Eleventh Amendment immunity therefore bears the burden of proving that he is a state official. Hutto v. S.C. Ret. Sys., 773 F.3d 536, 542 (4th Cir. 2014). "Whether an action is barred by the Eleventh Amendment is a question of law that we review de novo." Id.

In making this determination, "the most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." Id. at 543 (quoting Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456, 457 (4th Cir. 1987)). "[I]f the State treasury will be called upon to pay a judgment against a governmental

91

entity, then Eleventh Amendment immunity applies to that entity." Id. (quoting Cash, 242 F.3d at 223). If, however, the state treasury will not be liable for a judgment, sovereign immunity applies only where the "governmental entity is so connected to the State that the legal action against the entity would . . . amount to 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" Id. (quoting Cash, 242 F.3d at 224). In assessing whether allowing suit would offend a state's dignity, this Court considers "(1) the degree of control that the State exercises over the entity or the degree of autonomy from the State that the entity enjoys; (2) the scope of the entity's concerns—whether local or statewide[;] . . . and (3) the manner in which State law treats the entity." Id. at 546 (quoting Cash, 242 F.3d at 224).

### A.

I agree with the majority opinion that Gault has not met his burden of demonstrating that he is a state official for purposes of Eleventh Amendment immunity. Gault relies solely on Lawson's allegation in the second amended complaint that "the Union County Clerk of Court is a state office, existing and operating under the laws of the State of South Carolina" and on a South Carolina Supreme Court decision and several unpublished federal district court decisions. See Appellees' Br. 41. None

of these sources demonstrates that the state treasury would be liable for any judgment against Gault or that South Carolina would suffer any indignity from such a judgment.

Gault's reference to the South Carolina Supreme Court case State v. Sims, 18 S.C. 460 (1883), for the proposition that the court has "long held that the clerk of court . . . is a state officer," Appellees' Br. 41 (citation omitted), is wholly unpersuasive. Not only does the case date back to 1882, before the evolution of Eleventh Amendment jurisprudence, but it also presented no Eleventh Amendment issue. See Sims, 18 S.C. at 463. Although the court did refer to the Clerk of Court as a "state officer," it did not address whether a Clerk of Court's liability would affect the state treasury or state dignity such that the Clerk might be a state officer for purposes of the Eleventh Amendment. See id. Likewise, the unpublished federal district court decisions that Gault cites are similarly unavailing. None of the decisions analyzed whether the Clerk of Court was a state or local official under the relevant legal standard, and each merely presumed that the Clerk of Court is a state official for purposes of the Eleventh Amendment. See Appellees' Br. 41 (citing Green v. Hyatt, No. 4:09-2573-TLW-TER, 2010 WL 597203, at *4 (D.S.C. Feb. 16, 2010), aff'd, 385 F. App'x 318 (4th Cir. 2010) (unpublished) (per curiam); Harden v. Bodiford, No. 6:09-2362-HFF-WMC, 2009 WL 3417780, at *3 (D.S.C.

93

Oct. 21, 2009); <u>Muqit v. Kitchens</u>, No. 2:08-3959-CMC-RSC, 2009 WL 87429, at *3 (D.S.C. Jan. 13, 2009)). Gault has therefore failed to show that he is entitled to Eleventh Amendment immunity.

B.

Indeed, evidence on the record indicates that South Carolina's treasury would not be liable for a judgment against Gault. <u>A Handbook for County Government in South Carolina</u>, which includes a description of the role of Clerk of Court, provides that "individual county employees and officials" who are sued pursuant to § 1983 are "generally . . . covered by the county's insurance policy." J.A. 198, 200. It appears that the phrase "individual county employees and officials" includes the Clerk of Court, as "[a]ll of the funding for the clerk of court and the clerk's office is the responsibility of the county." <u>Id.</u> at 198.

Moreover, the record contains no indication that judgment against Gault would offend the dignity of South Carolina. It seems that the state's control over the Clerk of Court is limited; for instance, South Carolina's Judicial Council indicated that it had no authority to overrule Gault's decision to place Lawson on unpaid leave. In addition, the Clerk of Court is elected by the voters of a particular county and is the Clerk only of courts within that county. <u>See</u> S.C. Code Ann.

94

§§ 14-17-10, 14-17-20.  Accordingly, I would hold that Eleventh Amendment immunity does not bar Lawson's § 1983 claim for damages against Gault in his official capacity.

V.

For the foregoing reasons, I cannot join the majority's opinion merely reversing the district court's grant of summary judgment for Gault without even reaching a conclusion under Pickering balancing.  Instead, I would hold that summary judgment for Lawson is appropriate, as the Pickering balancing test—which this Court has every reason (and duty) to conduct on this record—weighs conclusively in Lawson's favor, the Elrod-Branti exception does not apply, and Gault is not entitled to qualified or Eleventh Amendment immunity.  Gault had ample notice and opportunity to present his arguments on the legal issues in this case—including any arguments under Pickering balancing—before the district court.  See Hr'g Tr. 6–7, Lawson, No. 7:13-CV-01050(TMC) (D.S.C. Oct. 30, 2014) ("But once this case gravitated into the Pickering thing, we addressed that in the reply brief and argued that we were entitled to summary judgment [on that basis as well].").  Most assuredly, there is no genuine dispute as to any material fact, and Lawson is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power

to enter summary judgments <u>sua</u> <u>sponte</u>, so long as the losing party was on notice that she had to come forward with all of her evidence."); <u>U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n</u>, 873 F.2d 731, 735–36 (4th Cir. 1989) (same); <u>see also</u> <u>Gibson v. Mayor & Council of City of Wilmington</u>, 355 F.3d 215, 224 (3d Cir. 2004) (recognizing three different exceptions to the ten-day notice requirement prior to a <u>sua</u> <u>sponte</u> grant of summary judgment—"the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue"—and holding that any of the three would justify a <u>sua</u> <u>sponte</u> grant of summary judgment in that case); <u>Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp.</u>, 216 F.3d 388, 398 (4th Cir. 2000) (reversing summary judgment against appellant and ordering entry of summary judgment in favor of appellant despite the fact that appellant never sought summary judgment in the district court); <u>Portsmouth Square Inc. v. S'holders Protective Comm.</u>, 770 F.2d 866, 869 (9th Cir. 1985) ("[S]ua <u>sponte</u> summary judgment is appropriate where one party moves for summary judgment and, after the hearing, it appears from all the evidence presented that there is no genuine issue of material fact and the <u>non-moving</u> party is entitled to judgment as a matter of law.").

* * * * *

I would reverse the judgment and remand with instructions to: (1) enter judgment of liability in favor of Appellant

96

Melanie Lawson and (2) conduct such proceedings as to remedy that the district court finds necessary and appropriate.